**In re VALLEY MEDIA, INC., Debtor.**

**No. 01–11353(PJW).**

United States Bankruptcy Court,
D. Delaware.

April 25, 2002.

Karen Jacobs Louden, Robert J. Dehney, Eric D. Schwartz, Jason W. Staib, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Valley Media, Inc.

William P. Bowden, Ashby & Geddes, Wilmington, DE, Jonathan N. Helfat, Houston & Rosen, P.C., New York City, to Congress Financial Corporation (Northwest).

Teresa K.D. Currier, Klett, Rooney, Lieber & Schorling, Wilmington, DE, Michael A. Bloom, Morgan, Lewis & Bockius, LLP, Philadelphia, PA, Counsel to the Committee.

Carl N. Kunz, III, Morris, James, Hitchens & Williams, LLP, R. Karl Hill, Seitz, Van Ogtrop & Green, P.A., Charles J. Brown, William D. Sullivan, Elzufon, Austin, Reardon, Tarlov & Mondell, P.A., Francis A. Monaco, Jr., Rachel M. Mersky, Brian J. McLaughlin, Walsh, Monzack & Monaco, P.A., Wilmington, DE, Michael L. Moskowitz, Richard E. Weltman, Weltman & Moskowitz, LLP, Christopher R. Whent, Christopher R. Whent, New York City, Counsel to Objecting Vendors.

## OPINION

PETER J. WALSH, Chief Judge.

This is with respect to the January 10, 2002 motion of Valley Media, Inc. ("Valley" or the "Debtor") to sell its inventory at auction[1] ("Auction Motion") (Doc. 118) and the objections made by certain consignment vendors ("Objecting Vendors")[2] to

---

1. The Debtor's motion is entitled: Motion of the Debtor For An Order Pursuant to 11 U.S.C. § 363 Authorizing 1.) Liquidation Procedures For Sale of Inventory And Miscellaneous Furniture, Fixtures And Equipment By Auction Free And Clear Of Liens, Encumbrances And Other Interests, And 2.) Approval of Contract With Great American Group As Auctioneer (Doc. 118).

2. The Objecting Vendors are listed in Real Authentic Sounds' Exhibit 1 as: Castle Music;

DTK Metrodome Ltd.; Snapper Music; Zeit Distribution; Revolver Music Limited; Diamante Media Group; Rockview Records; Evidence Music, Inc.; Justin Time Records, Inc.; Distribution Fusion III, Inc.; Checkered Past Records, LLC; Sugar Free Records, Inc.; Gearhead Records; GTS Records, Inc.; Real Authentic Sound, Inc.; Rounder Records Corp.; Schallplatten Produktion And Vertlieb, GmbH (SPV); D3 Entertainment, Inc.; Beatville Records; Blood and Fire Limited; Domo Records, Inc.; Eagle Music Group, Inc.; The

the Auction Motion ("Auction Objections")[3]. The Auction Objections were primarily filed by vendors who, prepetition, provided the DNA division of Valley ("DNA") with consignment goods under the terms of certain distribution agreements ("Distribution Agreements"). The Objecting Vendors seek to exclude inventory which they provided to DNA on a consignment basis ("Contested Inventory") from sale ("Auction Sale") under the Auction Motion. Motions have also been filed requesting relief from the automatic stay to recover the Contested Inventory held by the Debtor ("Relief Motions")[4]. Discovery was conducted, the various parties submitted briefs[5] on the matter and a

Music Cartel, Inc.; SST Records, Inc.; and Ron Petersen t/a Rotten Records, Inc.

Although not listed above, Music Club USA (Doc. 161) and Sonic Image Records (Doc. 174) filed timely objections to the Auction Motion and appeared telephonically at the February 26 and 27, 2002 hearing. ARC Music Productions International (Doc. 284) filed a motion for turnover of property which asserted similar arguments as the other Objecting Vendors who requested relief from the automatic stay to recover inventory. Therefore, these three vendors are included in the Court's use of the term "Objecting Vendors".

3. The objections related to the Contested Inventory are: Revelation Record's Objection to Motion for Order Authorizing Liquidation and Approving Great American Contract (Doc. 144), Justin Time Records et al.'s Objection to Motion of Debtor for Order Pursuant to 11 U.S.C. Section 363 Authorizing, Inter Alia, Liquidation of Inventory by Auction (Doc. 156), Objection of Music Club USA to Motion of Debtor for an Order pursuant to 11 U.S.C. § 363 Authorizing (1) Liquidation Procedures for Sale of Inventory by Auction (Doc. 161); Objection of Rounder Records to Motion of Debtor for Order Pursuant to 11 U.S.C. Section 363 Authorizing, Inter Alia, Liquidation Procedures for Sale of Inventory by Auction (Doc. 164); Objection of Castle Music, Ltd. et al. to Auction Motion filed by Debtor (Doc. 169); Opposition of Sonic Image Records to Motion of Debtor For an Order Authorizing (1) Liquidation Procedures For Sale of Inventory By Auction (Doc. 174), Objection of Certain Independent Labels to Motion for an Order Pursuant to 11 U.S.C. § 363 Authorizing (1) Liquidation Procedures for Sale of Inventory (Doc. 177); Motion of Louisiana Red Hot Records for Turnover of Personal Property and in Opposition to Debtor's Motion Pursuant to 11 U.S.C. Section 363 Authorizing (1) Liquidation Procedures for Sale of Inventory (D.I. 181); Objection of Mean Street Records to Motion of Debtor For An Order Authorizing Liquidation Procedures for Sale of Inventory (Doc. 200); Objection of D3 Entertainment, Inc. to Motion of Debtor for an Order Pursuant to 11 U.S.C. Section 363 Authorizing (1) Liquidation Procedures for Sale of Inventory (Doc. 213); and Revelation Records' Supplement to its Objection to Debtor's Motion to Sell Inventory (Doc. 441).

4. The following motions for relief from the automatic stay and/or turnover of property have been filed and are still pending: Real Authentic Sounds, Inc.'s Motion For Relief From The Stay (Doc. 50); Motion of Rounder Records Corp. For Turnover of Personal Property (Doc. 77); Ron Peterson t/a Rotten Records' Motion For Relief From the Automatic Stay (Doc. 123); Schallplatten Produktion and Vertieb, GmbH's Motion For Relief From The Automatic Stay (Doc. 126); Motion of D3 Entertainment Inc. For Relief from the Automatic Stay Pursuant to 11 U.S.C. § 392(d)(1) and (d)(2) (Doc. 127); Motion of Louisiana Red Hot Records For Turnover Of Personal Property And In Opposition to Debtor's Motion Pursuant to 11 U.S.C. Section 363 Authorizing (1) Liquidation Procedures for Sale of Inventory, Miscellaneous Furniture Fixtures and Equipment by Auction Free and Clear of Liens, Encumbrances and Other Interests And (2) Approval of Contract With Great American Group As Auctioneer (Doc. 181); Motion for Turnover by ARC Music Productions International (Doc. 284);and Motion for Relief From Stay of Certain Independent Labels (Doc. 503).

5. The following briefs have been submitted: Opening Brief in Support of Objection Of D3 Entertainment, Inc. (Doc. 210); Opening Brief of Real Authentic Sound, Inc., et al. (Doc. 212); Opening Brief of Certain Independent Labels (Doc. 244); Brief of the Official Committee of Unsecured Creditors (Doc. 390); Brief of Congress Financial Corp. (Northwest) (Doc. 393); Debtor's Answering

hearing was held on February 26 and 27, 2002 at which both live and deposition witness testimony[6] was presented regarding Valley's and DNA's operations. The primary issue in this matter is whether DNA can be considered a "merchant" under revised Uniform Commercial Code ("U.C.C.") § 9–102(a)(20) or a "person conducting business" under former U.C.C. § 2–326(3)(b). Subsequently, the parties[7] simultaneously submitted proposed findings of fact and conclusions of law[8] and,

finally, objections to the proposed findings of fact and conclusions of law[9]. For the reasons discussed below, I will overrule the Auction Objections and grant the Auction Motion as to the Contested Inventory provided that such sale complies with the scope of the permission to sell the Contested Inventory granted in the Distribution Agreements. I will also deny those Relief Motions related to recovery of the Contested Inventory by the Objecting Vendors. However, I find that the situations

Brief (Doc. 397); Reply Brief of Justin Time Records (Doc. 422); Reply Brief of Certain Consignment Suppliers (Doc. 435); Reply Brief of Certain Independent Labels (Doc. 436); Reply Brief of D3 Entertainment (Doc. 438); Revelation Records' Joinder to Brief Filed by Certain Independent Labels And Supplemental Objection to Debtor's Motion to Sell Inventory (Doc. 441).

6. The following witnesses gave testimony:
Live Testimony:
Lewis Garrett: Current President and Chief Operating Officer of the Debtor.
Gary Himelfarb: President and 95% owner of Real Authentic Sounds, Inc., ("RAS") an Objecting Vendor.
Eric Lemasters: President and owner of The Music Cartel Inc. ("MCI"), an Objecting Vendor.
Mark Dickinson: President and owner of Beatville Records ("Beatville"),an Objecting Vendor.
Deposition Testimony:
John Ruch: Director of Marketing and Label Relations for Valley's DNA division.
James Lawlor: Former Import Product Manager for Valley's DNA division.
James Colson: General Manager of Valley's DNA division from 1997 through mid 1999. Concurrently the Vice President of Valley's Independent Distribution Business and General Manager of Valley's DNA division from mid 1999 until his departure in November 2001.

7. The Objecting Vendors filed their post-hearing materials jointly. The Debtor, the Official Creditor's Committee and Congress Financial Corporation (Northwest) ("Congress") also filed their post-hearing materials jointly and I will refer to their arguments as being the Debtor's arguments. Both the Official Credi-

tors Committee and Congress are supporting Debtor's Auction Motion. Congress is Valley's largest secured creditor.

8. The findings of fact are:
The Objecting Vendors' Joint Proposed Findings of Fact and Conclusions of Law In Support of Their Objections to the Debtor's Motion for an Order Pursuant to 11 U.S.C. § 363... ("Obj. Vendors' FOF") (Doc. # 521) Proposed Findings of Fact and Conclusions of Law of the Debtor, The Official Committee of Unsecured Creditors, and Congress Financial Corp. (Northwest) On the Motion of Certain DNA Vendors for Relief From the Automatic Stay And Debtor's Motion for Approval of Auction Sales of Inventory. ("Debtor's FOF") (Doc. 522)

9. Objections to proposed findings of facts and conclusions of law:
Objection and Response Of the Objecting Vendors To Proposed Findings of Fact and Conclusions of Law of the Debtor, The Official Committee of Unsecured Creditors, and Congress Financial Corp. (Northwest) On the Motion of Certain DNA Vendors for Relief From the Automatic Stay And Debtor's Motion for Approval of Auction Sales of Inventory. (Obj. to Debtor's FOF) (Doc. 573)
Objections of the Debtor, The Official Committee of Unsecured Creditors and Congress Financial Corporation (Northwest) To The Joint Proposed Findings of Fact And Conclusions of Law Of the Objecting Vendor On the Motions Of Certain Of the Objecting Vendors For, Among Other Things, Relief From The Automatic Stay And Debtor's Motion For Approval of Auction Sales Of Inventory. ("Obj. to Objecting Vendor's FOF") (Doc. 575)

of The Music Cartel, Inc., Beatville Records and Rotten Records, Inc. are unique in that their Distribution Agreements may have terminated pre-petition and the final section of this opinion will discuss the applicability of this decision to the Contested Inventory claimed by these three Objecting Vendors. The following will serve as this Court's findings of fact and conclusions of law on this matter.

## BACKGROUND

Valley Media, Inc. ("Valley") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on November 20, 2001. Prior to filing, Valley was the largest full-line supplier of entertainment software products (primarily CDs, DVDs, and VHS tapes) in the United States. (RAS Ex. 34 at 1); (Tr. 2/27/02 Garrett at 95:23–24)[10]. Valley was a "one-stop" distributor (Tr. 2/26/02 Dickinson 54:10–11)(Tr. 2/27/02 Lawlor 21:25; Garrett 100:2–5) and as such carried a wide variety of materials including materials from every major record company as well as hundreds of import and independent labels. (Tr. 2/26/02 Dickinson 55:21–24); (Tr. 2/27/02 Lawlor 22:2–6; Garrett 100:2–5). Valley had over 600 product vendors who supplied inventory. (Tr. 2/27/02 Garrett 121:17, 168:15–17.)

DNA, formerly known as Distribution North America, was a wholly owned, unincorporated division of Valley. (Tr. 2/27/02 Lawlor 36:23–37:1.) DNA was formed in September 1994 as an equal partnership between Rounder Records and Valley. (RAS Ex. 34 at 1); (Tr. 2/27/02 Lawlor 20:6–11). In January 1997, Valley acquired Rounder Records' interest in DNA and thus, 100% ownership of DNA. (RAS Ex. 34 at 1); (Tr. 2/27/02 Lawlor 20:11–12). The fact that DNA has been wholly owned by Valley for all times relevant to this dispute has not been challenged. After the first quarter of 2001, Valley produced a marketing brochure ("Marketing Brochure") (RAS Ex. # 34) and attempted to sell DNA. (Tr. 2/27/02 Garrett 138:8–14; Colson 61:24–62:5.) The brochure portrays DNA as a separable unit of Valley that could be sold apart from Valley. (Tr. 2/27/02 Garrett 139:14–17.) However, none of the scenarios listed in the Marketing Brochure suggest that DNA could stand on its own without some combination of significant financing in the form of a $7 million to $16 million equity investment *and* either a continued affiliation with Valley for distribution services or an affiliation with a distributor or label. (RAS Ex. 34 at 8–9.) The Marketing Brochure was distributed on a limited basis and only some competing independent distributors and select major labels received it. (Tr. 2/27/02 Garrett 139:1–13.)

DNA had no officers or directors of its own (Tr. 2/27/02 Lawlor 36:23–37:1; Garrett 112:2–6) and the CEO of Valley had ultimate responsibility for the DNA division (Tr. 2/27/02 Garrett 112:13–18). DNA had its own staff. (Tr. 2/27/02 Colson 69:22–23.) Although these employees may have considered themselves employees of

---

**10.** Citations to the trial transcript are in the form: (Tr. Date, witness name, page: line) Citations to the exhibits are as follows: Debtor's Exhibits 1 through 5 cited herein as (Debtor Ex.# ) Consignors including Real Authentic Sound's Exhibits 1–34, cited herein as (RAS Ex.# ) Certain Independent Labels' Exhibits 1–16, cited herein as (CIL Ex.# ) D3 Entertainment, Inc.'s Exhibits 1–2, cited herein as (D3 Ex.# ) Citation herein to the Distribution Agreements generally will be to the Beatville Records' agreement (CIL.Ex. # 3) which is used a "representative" agreement and cited herein as: (DA ¶ x.x). Citations to specific admitted Distribution Agreements will be to the admitted exhibit.

DNA (Tr. 2/27/02 Lawlor 22:9–11), all employees working for the DNA division were employed and compensated by Valley (Tr. 2/27/02 Garrett 106:2–3,112:23–113:2). Although DNA was a division of Valley, the two had separate logos (Tr. 2/27/02 Colson 70:7–8), websites (Tr. 2/27/02 Colson 68:10–13) and registrations with the National Association of Recording Merchandisers (Tr. 2/26/02 Garrett 75:21–76:1–14). DNA had a separate profit and loss statement from Valley's which was generated using financial information provided by Valley. (Tr. 2/27/02 Garrett 135:19–22.)

DNA had supply relationships with approximately 150–200 vendors (the "DNA Vendors"). (Tr. 2/27/02 Garrett 104:12–105:9.) The DNA Vendors supplied inventory under either a terms relationship based on purchase invoices ("Terms Vendors") or a consignment relationship based on a Distribution Agreement ("Consignment Vendors"). (Tr. 2/27/02 Colson 76:2–6); (RAS Ex.19,21). The parties concur in their understanding of the primary difference between the terms and consignment models. Under a terms model, a distributor purchases inventory outright. The vendors invoice for products when shipped and the distributor pays based on the negotiated terms, usually 60–90 days from the date of invoice. (Tr. 2/27/02 Lawlor 28:20–29:22; Colson 52:9–25); (Tr. 2/26/02 Garrett 65:19–22). Under a consignment arrangement, the title to the inventory remains with the vendor and the goods are not paid for until the distributor sells the products. (Tr. 2/27/02 Lawlor 30:5–13; Colson 51:21–52:1, 52:19–53:6); (Tr. 2/26/02 Garrett 65:1–7). However, as will

be discussed below, despite the intent of the parties, the legal effect of the consignment relationship may be determined by provisions of the Uniform Commercial Code in certain situations.

DNA did not perform all the functions of a distributor and was dependent on Valley for many essential operational services. At trial Lewis Garrett, the current President of Valley, contrasted the capacities of the Valley and DNA operations by reviewing the twelve functions which he deemed necessary for a distributor to get product from a label that produces a music recording to an end user who purchases it for individual or retail use. (Tr. 2/27/02 Garrett 107:17–111:23.) Of the twelve operational functions which a distribution company must perform, DNA only performed two: sales and marketing. (Tr. 2/27/02 Garrett 110:18–20.)[11] The rest of the functions were performed for DNA by Valley through Valley employees with no connection to the DNA operations. These included: treasury and banking (Tr. 2/27/02 Garrett 108:17–21), product procurement (Tr. 2/27/02 Garrett 108:22–109:9), invoicing (Tr. 2/27/02 Garrett 109:10–18), customer service (Tr. 2/27/02 Garrett 109:19–20), warehousing and distribution (Tr. 2/27/02 Garrett 110:4–7), credit and collections (Tr. 2/27/02 Garrett 110:8–15) and various support functions including human resources, information technology ("I.T.") and financial reporting (Tr. 2/27/02 Garrett 110:16–18)(RAS Ex.34 at 6). DNA was assessed an overhead charge for the services Valley provided, including rent[12], and these charges were

11. DNA staff also assisted with Accounts Payable reconciliation for DNA and Jim Colson, the General Manager of DNA, performed some facets of customer service for DNA. (Tr. 2/27/02 Garrett 109:19–110:3,110:18–21.) However, Valley's Vice President of finance approved all of DNA's payments before they

were made. (Tr. 2/27/02 Garrett 110:21–22.) The bulk of the customer service was provided by a 40 member department in Valley. (Tr. 2/27/02 Garrett 109:19–110:4.)

12. Valley was the contracting party on all leases for space used by DNA and Valley paid

reflected in the DNA financial statements. (Tr. 2/27/02 Garrett 165:11–20.)

As a distributor, Valley obtained music product from vendors through purchasing and procurement, stored the procured inventory in one of two large distribution facilities, marketed and sold the inventory through three distribution lines and then shipped the purchased inventory. DNA was one of these three distribution lines and as such was just one part of the sales and distribution side of Valley's overall operation.

The purchasing and procurement functions for Valley's three distribution channels were performed by employees in Valley's buying department. (Tr. 2/27/02 Garrett 98:16–23.) Two employees working in the DNA division procured product from DNA Vendors that was distributed through all three distribution channels. (Tr. 2/27/02 Garrett 108:25–109:9.) While these employees may have acted in DNA's name, they were Valley employees. *Id.* They also reported to Garrett while he was the Executive Vice President responsible for Valley's buying, marketing and sales and thus were not independent of Valley's authority (Tr. 2/27/02 Garrett 92:18–93:13, 97:8–11.)

Valley stocked over 325,000 different titles or "SKUs" (stock keeping units), including all titles procured from DNA Vendors, at two large distribution facilities in Woodland, California and Louisville, Kentucky. (Tr. 2/27/02 Garrett 97:15–16,-111:12–14.) After a particular title was ordered from a vendor by Valley or DNA, it was received and stored at one of Valley's two distribution centers. (Tr. 2/27/02 Garrett 98:16–99:4.) When an order was received from a customer ordering through one of the three distribution lines, product was picked from its storage loca-

tion in the warehouse, packaged and shipped to the customer. (Tr. 2/27/02 Garrett 99:4–6.) All of these warehouse and distribution functions were carried out by Valley employees. (Tr. 2/27/02 Garrett 99:7–11.)

All of the inventory held at the two warehouse facilities, whether obtained by terms or consignment, was comingled (Tr. 2/27/02 Garrett 122:1–8, 124:4–8) and essentially indistinguishable as to whether it was held on a terms or a consignment basis (Tr. 2/27/02 Garrett 121:16–122:2). No signs were posted in Valley's warehouses, nor were there any markings on the inventory that would indicate to an outside observer that some of the inventory held by Valley had been obtained on a consignment basis. (Tr. 2/27/02 Garrett 122:5–8, 124:4–8.) Valley was able to track inventory locations, sources and amounts by means of a computer program. This system allowed Valley to track the titles on hand and differentiate between consignment and terms inventory. (Tr. 2/27/02 Garrett 149:16–150:18, 160:16–161:10.) Without access to this system, one could only differentiate the vendor source of the inventory by reading the bar code on each CD. (Tr. 2/26/02 LeMasters 49:11–50:1); (Tr. 2/27/02 Garrett 149:3–15). Valley used this system to produce monthly reports to Congress Financial Corporation (Northwest) ("Congress") which broke down the inventory on a consigned and terms basis. (Tr. 2/27/02 Garrett 160:16–161:10.) Valley was also able to segregate the Contested Inventory prior to the Auction Sale. (Tr. 2/26/02 Garrett 70:12–23.)

Valley's sales and distribution were conducted through three channels: Full–Line Distribution, I–Fulfillment and Independent Distribution. Customers who pur-

the rent for those spaces. (Tr. 2/27/02 Garrett 122:13–20.)

chased through the Full–Line[13] and I–Fill[14] distribution lines had full access to all 325,000 titles in the Valley catalogue. Valley had over 600 product vendors who provided these titles. (Tr. 2/27/02 Garrett 121:17, 168:15–17.) The Valley catalogue of 325,000 titles included music from four main sources[15], including product from the DNA Vendors (including the Objecting Vendors). DNA sales and marketing operations formed the third Valley distribution line. (Tr. 2/27/02 Garrett 104:9–20.) Valley purchased the product for the DNA distribution line from the DNA Vendors (Tr. 2/27/02 Garrett 109:8–9) and DNA distributed it to all types of retailers and wholesalers around the country (Tr. 2/27/02 Lawlor 21:1–3). The DNA distribution line customers did not have access to Valley's full 325,000 title catalogue and could only purchase product provided by the DNA Vendors. (Tr. 2/27/02 Garrett 104:12–105:9.) If product from DNA Vendors was purchased through the Full–Line Distribution or I–Fulfillment lines, the purchased product would first be transferred from DNA to Valley via an intracompany transfer. (Tr. 2/27/02 Garrett 105:10–12, 135:5–18.) This transfer was recorded on the DNA and Valley financial statements. (Tr. 2/27/02 Garrett 135:23–25.)

Prior to 1996, all of DNA's vendors were on a terms basis. (Tr. 2/27/02 Lawlor 28:16–25, 29:23–30:3) The consignment model was implemented by Jim Colson in 1996 or 1997 to make DNA more profitable. (Tr. 2/27/02 Lawlor 29:23–30:3; Colson 48:5–49:4, 59:3–13.) As of the filing date, 80 to 90 of the approximately 200 DNA suppliers were operating on terms and 100 to 110 operated on consignment. (Tr. 2/27/02 Garrett 117:25–118:1.)

The consignment relationship provided certain advantages to Valley. No cash was required to obtain inventory since no payment was made until Valley or DNA sold the consigned products. (Tr. 2/26/02 Garrett 65:1–22)(Tr. 2/27/02 Colson 53:7–14.) This allowed Valley to maintain higher levels of inventory so that product would be available for customer orders. (Tr. 2/26/02 Garrett 65:5–13)(Tr. 2/27/02 Colson 53:15–25.) Since Valley's cash was not impacted, it could save on shipping costs by making bulk returns to labels a few times a year. (Tr. 2/27/02 Colson 54:1–12.) The amount of consigned inventory did not affect the availability of credit under Valley's credit line with Congress. (Tr. 2/27/02 Colson 54:13–55:19.)

*Valley's Creditors:*

At the time of filing, Valley had over 1,000 creditors including equipment les-

---

**13.** The Full–Line distribution channel targeted "brick and mortar" retail stores around the country and made all 325,000 titles available to stores ranging in size from a local record store to Tower Records. (Tr. 2/27/02 Garrett 99:17–24, 100:11–19.) All Full–Line sale operations were conducted by Valley employees. (Tr. 2/27/02 Garrett 101:15–17.)

**14.** The I–Fill channel served approximately 125 businesses that fulfilled orders over the Internet, such as Amazon.com and other Internet retailers, giving these retailers access to all 325,000 titles carried by Valley. (Tr. 2/27/02 Garrett 102:1–10.) All orders placed through I–Fill were processed by Valley employees. (Tr. 2/27/02 Garrett 102:24–103:1.)

**15.** Valley obtained CDs and other materials for its music distribution business from four principal sources: (a) all five major labels, including EMI Music Distribution, Universal Music and Video Distribution, Warner/Elektra/Atlantic, BMG Distribution and Sony Music Inc.; (b) distributors such as Koch, RED and Caroline; (c) non-exclusive independent labels which did business with Valley as well as other distributors on a non-exclusive basis; and (d) exclusive or near exclusive labels. (Tr. 2/27/02 Garrett 96:8–97:3, 97:22–98:1.) The DNA Vendors and thus the Objecting Vendors were in the exclusive or near exclusive label category. (Tr. 2/27/02 Garrett 98:2–5.)

sors, travel agents, utilities, and insurance providers, most of whom had no reason to know of the consigned nature of Valley's inventory. (Tr. 2/27/02 Garrett 130:5–132:20.); (Debtor's Ex.4 at Schedules D, E & F, listing Valley creditors). Only Congress, Valley's largest secured creditor, and the Consignment Vendors were clearly aware that Valley obtained consignment inventory through it DNA division. (Tr. 2/27/02 Garrett 144:25–145:2.) Some of the Terms Vendors may also have been aware, if they were approached by James Colson with a proposal for a consignment arrangement. (Tr. 2/27/02 Colson 71:4–12, 59:3–13.) A limited number of major labels and other distributors to whom Valley submitted the Marketing Brochure for the spin-off sale of DNA may have been aware of the consignment nature of the inventory obtained for the DNA division of Valley. (Tr. 2/27/02 Garrett 139:1–13); (RAS Ex.34). However, no showing was made at trial that any other creditors of Valley were actually aware of the consignment arrangements. (Tr. 2/27/02 Garrett 130:5–132:20; Colson 71:4–12.) Both Colson and Garret testified that they were not aware of any other Valley creditors who had knowledge of DNA's consignment relationships with its vendors. *Id.*

*Potential DNA Creditors:*

At trial the Objecting Vendors attempted to prove that DNA had creditors[16]. The following potential creditors of the DNA division in the year preceding bankruptcy were identified at trial: the DNA Vendors (Tr. 2/27/02 Garrett 139:18–140:5, 141:3–19), Valley employees working for DNA (Tr. 2/27/02 Garrett 140:5–20), and printers and other marketing vendors hired by DNA (Tr. 2/27/02 Garrett 140:21–

141:2). The creditors would also have included Congress and Valley. (Id. at 141:20–142:3.) As of the filing date, there were approximately 200 DNA Vendors of which 100–110 were Consignment Vendors. (Tr. 2/27/02 Garrett 117:25–118:1, 168:12–14). The number of employees, printers, or marketing creditors was not established. Some number of the Terms Vendors brought on after 1996 may have known about the consignment relationship because James Colson attempted to bring new suppliers on as consignment vendors. (Tr. 2/27/02 Garrett 141:3–16.) The Consignment Vendors, Congress and Valley were clearly aware of DNA's consignment arrangements. (Tr. 2/27/02 Garrett 139:18–140:5, 141:20–142:3.)

*Valley's Consigned Inventory*

On the petition date, Valley had in its possession approximately $108 million worth of inventory (Tr. 2/26/02 Garrett 68:5–7) of which more than $91.5 million was purchased on terms (Tr. 2/27/02 Garrett 120:10–12). As of the petition date, consigned goods accounted for less than 15% of Valley's total inventory base. (Tr. 2/27/02 Garrett 127:4–8); (RAS Ex. 19). Historically, the percentage of consignment inventory held by Valley was half that number. *Id.* As of November 25, 2000, approximately one year prior to Valley's petition date, consigned goods accounted for only 7.5% of Valley's total inventory base[17]. (Tr. 2/27/02 Garrett 126:25–127:3.) The increase in the percentage of consigned inventory from 7.5% in November 2000 to 14.82% in November 2001 was caused by a decrease in the value of the terms inventory while the value of the consigned inventory was almost the

---

16. The capacity of DNA to have creditors will be discussed in section 1 of this opinion, *infra.*

17. As of that time Valley had approximately $229 million in inventory and $17.2 million in consigned inventory. (Tr. 2/26/02 Garrett 67:23–68:2);(RAS Ex.19).

same at the beginning and end of that one year period despite a bubble mid-year. (Tr. 2/26/02 Garrett 68:22–69:9); (RAS Ex.19). The value of Valley's terms inventory declined by approximately $120 million during the year preceding bankruptcy (Tr. 2/26/02 Garrett 67:24–68:16) as Valley exited the video products market and returned other obsolete stock purchased on terms to the suppliers for credit (Tr. 2/27/02 Garrett 125:21–126:2, 126:14–24).

*DNA's Consigned Inventory:*

Valley's DNA division had supplied approximately $26.3 million worth of the Valley inventory on hand as of the filing date. (Tr. 2/27/02 Garrett 118:11–15); (RAS Ex.15). Roughly $15.7 million (59%) of that $26.3 million was held on a consignment basis (Tr. 2/27/02 Garrett 119:10–15) while the balance had been purchased on a terms basis (Tr. 2/27/02 Garrett 119:10–120:16)(Debtor Ex.3).

*Distribution Agreements*

The Distribution Agreements at issue here are substantially identical, other than the names of parties and date of execution. (Tr. 2/27/02 Lawlor 25:17–21.) Each was signed by James Colson, the General Manager of DNA. (*See* RAS Ex.2–11, CIL Ex.1–7, D3 Ex.1.) The purpose of the Distribution Agreements was to place the Consignment Vendor's product in DNA's possession and permit DNA through Valley or other sub-dealers to distribute and sell goods provided by· the DNA Vendors. (Tr. 2/26/02 Lemasters 42:13–19, Dickinson 60:16–18); (DA ¶¶ 2, 4.1,5.1, 5.2,9.1, 9.2). The three aspects of the Distribution Agreements relevant to the dispute before me are: the guarantee of good title in the contested inventory, the right to sell and use the consigned goods containing the copyrighted material, and the methods and effect of termination. I will reference other provisions as necessary in the subsequent discussion.

*Good Title Warranties:*

The Consignment Vendors, made a number of representations and warranties in connection with the Distribution Agreements to ensure that DNA, as their distribution agent, would pass clear title to the Product [18] when the consigned inventory was sold, including that such sale was also with permission from the third party copyright holders so that no copyright would be infringed. (DA ¶¶ 7.1(a)-(e), 9.1.) Specifically, the Consignment Vendors represented and warranted that they held "good, clear, and marketable title" to the Product (DA ¶ 7.1(a)), that the DNA Vendors had obtained all necessary rights and consents to allow Valley to distribute the Product such that Valley need not obtain third party authority to sell the Product (DA ¶7.1(c)) and that the Products and their distribution would not violate the copyright of any third party (DA ¶¶ 7.1(d), 9.1). As Lemasters and Dickinson testified at trial, the Consignment Vendors entered into agreements with artists granting the labels the ability to produce and/or the authority to sell goods embodying the artist's work. (Tr. 2/26/02 Lemasters 34:19–35:24, 42:5–16; Dickinson 60:12–18.) That authority to sell goods embodying the third party artists' copyrights was regranted by the Consigning Vendors to DNA through the Distribution Agreements. (DA ¶¶ 2,5.1(a), 7.1(a)-(e), 9.1, 9.2.) Additionally, the Consignment Vendors made themselves liable for any payments to these copyright holders arising from sale of the Product by retaining the obligation

---

**18.** "The term 'Products' means all phonorecords embodying or derived from sound recordings and any copies of audiovisual works which during the Term are owned or controlled by Label and are released by Label, or for which Label possesses the right to authorize distribution." (DA ¶ 1.) The Contested Inventory falls within this definition.

to pay "all costs of production and manufacture of the Product, including but not limited to:...the payment of royalties, (including mechanical royalties), fees, or other sums to artists, producers, record labels or others..." (DA ¶ 5.3(a).)

*Licenses to sell and use:*

Pursuant to the Distribution Agreements, the DNA Consignment Vendors named either "DNA" or "DNA, a division of Valley Media" as sole and exclusive distributor of the Product (i.e., phonorecords and audiovisual works) in the United States, its territories and possessions. (D.A.¶¶ 1,2.) Valley, through the Objecting Vendors' agreements with DNA, was specifically authorized to distribute Product provided by the Consignment Vendors upon the execution of the Distribution Agreement. (Tr. 2/26/02 Lemasters 42:13–19; Dickinson 60:16–18);(Tr. 2/27/02 Lawlor 45:16–21). The Distribution Agreements also allowed DNA to appoint Valley as a sub dealer or agent for purposes of distribution. (DA ¶ 5.2.) The Consignment Vendors also granted Valley under the heading "License to Use Materials" the right "to reproduce ... distribute and display, and otherwise use the Materials" in connection with the distribution and sale of the Product [19]. (DA ¶ 9.2.) This authorization was limited to the term of the Distribution Agreements [20]. *See* DA ¶ 2 (limiting grant of distribution rights to dis-

tribute Product to term of agreement); DA ¶ 9.2 (limiting use of Materials to term of the agreement); DA ¶ 12 (defining term of agreement); DA ¶ 13.1 (setting forth method of termination for material breach). During the term of the Distribution Agreements, DNA had the sole discretion to determine the method of distribution and the collection of payment (DA ¶ 5.1(a)), as well as the prices at which the Product was sold (DA ¶ 4.1).

*Termination of the Agreements:*

The Distribution Agreements contain specific means of termination which require a material breach, written notification of breach to the breaching party and, generally, a 30 day cure period. (DA ¶ 13.1.) Certain rights and obligations survive termination of the contract including the indemnification covenants [21]. (DA ¶ 13.2.) The Distribution Agreements may also be terminated pursuant to paragraph 12 which requires written notice by either party 90 days before the automatic renewal date. (DA ¶ 12.)

## DISCUSSION

■ The Objecting Vendors seek the denial of the Auction Motion with regard to the Contested Inventory on the basis of two primary arguments: (1) The Objecting Vendors have superior rights in the Con-

---

19. The term "Materials" is specifically defined in the Distribution Agreements to include "the rights in and to the names, designs, artwork, packaging, and advertising associated with its Products, including all performances and artistic, musical material embodied in the Products and the trademarks and logos used in connection therewith, together with any new or revised names, designs, artwork, packaging, and advertising which Label may adopt to identify it or any Product during the Term (collectively Materials)." (DA ¶ 9.1.)

20. In some agreements there was a limited right to fill outstanding orders after the termination date. (*See* RAS Ex. 6 at ¶ 4.2(b).)

21. The Consignment Vendors have covenanted to indemnify the DNA for any "damages, liabilities, costs and expenses (including, without limitation, reasonable attorney fees) which may be sustained or suffered ...arising out of any actual or alleged breach by Label of any of the representations, warranties, agreements or covenants of Label under this Agreement." (DA ¶ 10.1.) DNA granted the same indemnification to the Consignment Vendors. (DA ¶ 10.2.)

tested Inventory under applicable state law as to both Congress and the Debtor; and (2) The sale of the Contested Inventory will be a "first sale" without the requisite permission of the Objecting Vendors and third party copyright holders and would thus violate federal copyright law and give rise to actions for infringement. The Debtor refutes both of these assertions. The Objecting Vendors also seek equitable relief from the Auction Sale claiming that the proposed sale would place an inequitable burden on the Objecting Vendors because, as a matter of industry practice, the Contested Inventory may be returned to the DNA Vendors for full credit, the Objecting Vendors have not yet been paid for the inventory, and, indeed, may also be liable for royalties to third parties on that inventory. The Debtor responds that the Objecting Vendors were well aware of that industry practice as reflected in the Distribution Agreements' return provisions. (DA ¶¶ 4.2(a), 4.2(e), 4.2(f), 13.3.) I will address each of these arguments in turn.

## 1. THE OBJECTING VENDORS' RIGHTS IN THE CONTESTED INVENTORY:

The Objecting Vendors base their Auction Objections and Relief Motions on the assertion that under the terms of the Distribution Agreements, which are governed by California law [22], they are consignors and thus the owners of the Contested Inventory. However, the Objecting Vendors may be estopped from asserting those ownership rights under California law when claims are made against the Contested Inventory in the possession of Valley by Valley's creditors. The Valley creditor asserting a claim against the Contested Inventory in this proceeding is the Debtor in Possession, as a judicial lien creditor of the pre-petition debtor, Valley, pursuant to 11 U.S.C. §§ 544(a)(1) & 1107(a) [23].

While California courts may determine that an agreement constitutes a consignment based on the intent of the parties [24], such a consignment contract alone does not necessarily allow a consignor's ownership interests in the consigned goods to prevail over the claims of the consignee's creditors. *Bank of Cal. v. Thornton–Blue Pac., Inc.*, 53 Cal.App.4th 841, 62 Cal.Rptr.2d 90, 94 (1997) (adoption of 2326 made retention of title by consignor irrelevant to resolving claims to consigned goods as between consignor and creditors of consignee); *Minor v. Stevenson*, 227 Cal. App.3d 1613, 278 · Cal.Rptr. 558, 562 (1991)(intent of the parties to form a consignment relationship does not control when U.C.C. § 2–326 applies); *accord Windsor Communications Group, Inc. v. Freedom Greeting Card Co., Inc. (In re Windsor Communications ·Group, Inc.),*

---

**22.** "The validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of California applicable to contracts entered into and performed entirely within said State." (DA ¶ 14.3.)

**23.** The Objecting Vendors misapprehend the priority contest at issue in this proceeding. The priority contest is between the Debtor in Possession in the guise of a judicial lien creditor of the consignee Valley and the Objecting Vendors as unperfected consignors of inventory held by Valley. Congress' priority in the Contested Inventory or its proceeds is not at issue here and will be resolved between the Debtor, as a trustee and fiduciary for all of the estate's creditors, and Congress at a later date.

**24.** *See Bank of Cal. v. Thornton–Blue Pac., Inc.*, 53 Cal.App.4th 841, 62 Cal.Rptr.2d 90, 94 (1997)(defining consignment); *Consolidated Accessories Corp. v. Franchise Tax Board,* 161 Cal.App.3d 1036, 1040, 208 Cal.Rptr. 74 (1984)(finding that as between consignor and consignee, the intent to form a consignment is controlling).

63 B.R. 767, 770 (Bankr.E.D.Pa.1986), *rev'd on other grounds* 815 F.2d 697 (3d Cir.1987). The parties agree that the ability of the Objecting Vendors to assert their ownership rights against a creditor of the consignee in the context of the consignment relationship formed by the Distribution Agreements is governed either by former U.C.C. § 2–326[25] (prior to July 1, 2001) or by revised U.C.C. § 9–102(a)(20)[26] (from July 01, 2001 forward). Revised U.C.C. § 9–102–(a)(20) also implicates revised U.C.C. §§ 9–319(a)[27] & 9–103(d)[28]. I need not decide which code provision applies in this case since the parties have agreed that the analysis of

---

**25.** Former U.C.C. § 2–326 was enacted as Cal. Com.Code § 2326 which states:

"(1) Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is...(b) A "sale or return" if the goods are delivered primarily for resale.

(2) Except as provided in subdivision (3),... goods held on sale or return are subject to [the claims of the buyer's creditors] while in the buyer's possession.

(3) Where goods are delivered to a person for sale and the person maintains a place of business at which he or she deals in goods of the kind involved, under a name other than the name of the person making the delivery, *then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return.* The provisions of this subdivision are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as "on consignment" or "on memorandum". However this subdivision is not applicable if the person making the delivery does any of the following:

(b) *Establishes that the person conducting the business is generally known by his or her creditors to be substantially engaged in selling the goods of others.*

(c) Complies with the filing provisions of the division on secured transactions (Division 9) ..."

Ann. Cal. Com.Code § 2326(1)(2) & (3)(West 2001), (text of section operative until July 01, 2001) (emphasis added).

**26.** Revised U.C.C. § 9–102(a)(20) is enacted in the California Code at Cal. Com.Code § 9102(a)(20), effective July 01, 2001, and reads in relevant part:

"(20) 'Consignment' means a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and *all of the following conditions are satisfied:*

(A) The *merchant* satisfies all of the following conditions:
(i) He or she deals in goods of that kind under a name other than the name of the person making delivery.
(ii) He or she is not an auctioneer.
*(iii) He or she is **not** generally known by its creditors to be substantially engaged in selling the goods of others.*
(B) With respect to each delivery, the aggregate value of the goods is one thousand dollars ($1,000) or more at the time of delivery.
(C) The goods are not consumer goods immediately before delivery.
(D) The transaction does not create a security interest that secures an obligation."

Ann. Cal. Com.Code § 9102(a)(20) (West 2002)(effective July 01, 2001) (emphasis added).

**27.** Revised U.C.C. § 9–319 is enacted in the California Code at Cal. Com.Code § 9319, effective July 01, 2001, and reads in relevant part:

"(a) Except as otherwise provided in subdivision (b), for purposes of determining the rights of creditors of, and purchasers for value of goods from, a consignee, while the goods are in the possession of the consignee, the consignee is deemed to have rights and title to the goods identical to those the consignor had or had power to transfer." Ann. Cal. Com.Code § 9319(a) (West 2001)(effective July 01, 2001).

This language mirrors the language in former Cal. Com.Code § 2326(3).

**28.** Revised U.C.C. § 9–103(d) is enacted in the California Code at Cal. Com.Code § 9103(d) effective July 01, 2001 and reads in relevant part: "The security interest of a consignor in goods that are the subject of a consignment is a purchase money security interest in inventory." Ann. Cal. Com.Code § 9103(d) (West 2002) (effective July 01, 2001).

the Objecting Vendors' rights to the Contested Inventory remains the same under either the former or the revised U.C.C. provisions as enacted in California.

■ Once it is determined that either former U.C.C. § 2–326(3) or revised U.C.C. §§ 9–102(a)(20) & 9–319(a) applies, the goods are deemed to be on sale or return with respect to claims made by the creditors of the consignee. *See Minor*, 278 Cal.Rptr. at 563–64 (holding that if the transaction fulfills the prerequisites of former U.C.C. § 2–326(3) [29], a conclusive presumption that the goods are held on a "sale or return" basis arises and former U.C.C. § 2–326 governs the competing rights of the consignor and the creditors of the consignee); *accord Quaker City Iron Works, Inc. v. Ganz (In re Wicaco Mach. Corp.)*, 49 B.R. 340, 343 (E.D.Pa.1984); *In re Windsor*, 63 B.R. at 769–70. This fiction allows the consignee's creditors to attach the consigned goods as if the consignee actually had title to the goods. Neither the application of former U.C.C. § 2–326(3) or revised U.C.C. § 9–319(a) affects the ownership rights of the consignor in relation to the consignee [30]. Therefore, I must reject the Debtor's contention that the Objecting Vendors lost title to the Contested Inventory under California law when they did not perfect their consignment interests and that such title then vested in Valley. (*See* Debtor's FOF, Doc. 522 at ¶ 61.)

■ A consignor may prevent the application of former U.C.C. § 2–326(3) or revised U.C.C. §§ 9–102(a)(20) & 9–319(a) if it qualifies for one of the two exceptions provided under California law. *Minor*, 278 Cal.Rptr. at 563; *accord, In re BRI Corp.*, 88 B.R. 71, 73–74 (Bankr.E.D.Pa. 1988); *In re Wicaco Mach. Corp.*, 49 B.R. at 343–44. The two exceptions are the same whether the former or revised code applies. The consignor must either have (1) filed a UCC–1 financing statement as required under U.C.C. Article 9 or (2) prove that the deliveree is generally known by his creditors to be substantially engaged in selling the goods of others. *See Minor*, 278 Cal.Rptr. at 563 (holding that consignors may rebut the conclusive presumption that goods are on sale or return); *Escrow Connection v. Haas*, 189 Cal. App.3d 1640, 235 Cal.Rptr. 200, 202 n. 4 (1987); *accord In re BRI Corp.*, 88 B.R. at 74; *Wonder Indus. v. Chimneys, Chimes 'N Chairs, Inc. (In re Chimneys, Chimes 'N Chairs, Inc.)*, 17 B.R. 776, 778–79 (Bankr.N.D.Ohio 1982). If either of these notice requirements of U.C.C. Article 2 are met, then former U.C.C. § 2–326(3) and revised U.C.C. §§ 9–102(a)(20) & 9–319(a) will not apply and the consignee's creditors may not reach the consigned goods in the consignee's possession [31]. *See id.*

---

**29.** The elements that must be met are 1)goods are delivered to a person for sale; and 2) the person maintains a place of business at which he or she deals in goods of the kind involved; 3) under a name other than the name of the person making the delivery. *See Minor*, 278 Cal.Rptr. at 561. These elements are fulfilled in the instant case.

**30.** Once the transaction is determined to fall within the revised U.C.C. § 9–102(a)(20) definition of consignment, then revised U.C.C. § 9–319(a) applies when a creditor of the consignee seeks to recover against the consigned goods. Once again, the consignee is deemed to have acquired title, but only for the purposes of determining the rights of creditors of the consignee, not the rights of the consignee to the consigned goods.

**31.** "These exceptions the involve the consignor giving notice to the consignee's creditors that goods do not in fact belong to the consignee; when the consignor gives such notice, the transaction is treated as a true consignment rather than a sale or return." *Heller Financial, Inc. v. Samuel Schick, Inc. (In re Wedlo Holdings, Inc.)*, 248 B.R. 336, 341 (Bankr.N.D.Ill.2000).

It is undisputed that none of the Objecting Vendors perfected their interests in the Contested Inventory by meeting the U.C.C. Article 9 filing requirements before the bankruptcy preference period.[32] Therefore, the key question is whether or not the Objecting Vendors can demonstrate that the deliveree is generally known by its creditors to be substantially engaged in the selling of goods of others. While the purpose of this test is different under former U.C.C. § 2–326(3) and revised U.C.C. § 9–102(a)(20), the effect of proving this proposition is the same under either provision.[33] If the Objecting Vendors can prove this proposition, then former U.C.C. § 2–326(3) and revised U.C.C. § 9–102(a)(20) and 9–319(a) will be inapplicable and the Objecting Vendors' will be able to assert their ownership interest in the Contested Inventory against creditors of the Debtor such as a judicial lien creditor.

**32.** The one Objecting Vendor that filed a UCC–1 financing statement was Revelation Records. According to trial testimony, the financing statement was filed within 90 days prior to bankruptcy (Tr. 2/27/02 Garrett 129:20–25) and is thus voidable by the Debtor in Possession. No contrary evidence was offered at trial.

Although not part of the record, I also note that the Dunn & Bradstreet Public Records Report attached as Exhibit B to the Auction Motion (Doc. 118) indicates that Revelation Records filed on October 12, 2001.

**33.** The Court notes that the purpose of the Generally Known/Substantially Related Test is slightly different under the former and revised U.C.C. as enacted in California. Under former Cal. Com.Code. § 2326, the fulfillment of this test preserves the consignment arrangement by preventing the application of Cal. Com.Code. § 2326(3) which would otherwise deem the consigned goods to be on "sale or return" with regard to the consignee's creditors and thus subject the consigned goods in the consignee's possession to the claims of those creditors.

*Legal standard*

■ Proving that the deliveree is generally known by its creditors to be substantially engaged in the selling of goods of others is ultimately the burden of the consignor. *Haas*, 235 Cal.Rptr. at 204; *accord ATG Aerospace Ltd. v. High–Line Aviation, Ltd. (In the Matter of High–Line Aviation, Inc.)*, 149 B.R. 730, 738 (Bankr.N.D.Ga.1992); *In re BRI Corp.*, 88 B.R. at 74–75; *Multibank Nat'l of W. Mass., N.A. v. State St. Auto Sales, Inc. (In re State St. Auto Sales, Inc.)*, 81 B.R. 215, 218 (Bankr.D.Mass.1988). The consignor must prove by a preponderance of the evidence (1) that the consignee is substantially engaged in selling the goods of others, *and* (2) that it is generally known by the creditors of the consignee that this is the case. *See Leverett Co. v. Arthur A. Everts Co. (In re Arthur A. Everts Co.)*, 35 B.R. 706, 708 (Bankr.N.D.Tex.1984); *Steege v. Affiliated Bank/N. Shore Nat'l (In re Alper–Richman Furs)*, 147 B.R.

Under revised Cal. Com.Code. 9102(a)(20), however, the fulfillment of this test (which is actually the failure to meet one of the requirements of being a merchant under revised Cal. Com.Code. 9102(a)(20)(A)(iii)—*See* note 26, *supra*) allows the goods to **escape** inclusion in the definition of consignment because the consignee would not fit the definition of "merchant". If the consignee is not a merchant, then the relationship is not a consignment and Cal. Com.Code. § 9319(a) does not apply. Cal. Com.Code. § 9319(a) is the provision which allows creditors of the consignee to reach consigned inventory in the consignee's possession. The relationship also escapes treatment as a purchase money security interest under revised Cal. Com.Code. § 9103.

Since the parties have agreed that the test is the same under both former Cal. Com.Code. § 2326 and revised Cal. Com.Code. § 9102(a)(20), the Court *will not* consider any assertion by the Objecting Vendors that the Contested Inventory was a consignment or any assertion by the Debtor that the Contested Inventory was *not* a consignment to be an admission for the purposes of revised Cal. Com.Code. § 9102(a)(20).

140, 150 (Bankr.N.D.Ill.1992). Both prongs of this test must be satisfied in order for the consignor to avoid the application of former U.C.C. § 2–326(3) and revised U.C.C. § 9–102(a)(20). *See In re State St. Auto Sales*, 81 B.R. at 218 (finding that even if general knowledge prong met, consignor still has to prove the substantially engaged prong to prevail); *High–Line Aviation, Inc.*, 149 B.R. at 738. In order to be "substantially engaged" in selling the goods of others, a merchant must not hold less than 20% of the value of its inventory on a consignment basis. *See Heller Financial, Inc. v. Samuel Schick, Inc. (In re Wedlo Holdings, Inc.)*, 248 B.R. 336, 342 (Bankr.N.D.Ill.2000) (holding, as a matter of law, that consignee who obtained only 15% to 20% of its inventory on consignment was not substantially engaged in selling the goods of others)[34]. To satisfy the "generally known" prong of the test, the Objecting Vendors must prove that a majority of the debtor-consignee's creditors were aware that the consignee was substantially engaged in selling the goods of others, i.e. consignment sales. *In re BRI Corp.*, 88 B.R. at 75. That majority is determined by the number of creditors, not by the amount of creditor claims. *See In re Wicaco Mach. Corp.*, 49 B.R. at 344 (holding that one-fifth of creditors knowing of consignment relationship does not satis-

fy general knowledge requirement, notwithstanding that such creditors represented 63% of claims against debtor)[35]. Testimony as to general knowledge in the industry is insufficient to prove knowledge by a majority of creditors. *See In re Wedlo Holdings*, 248 B.R. at 341–42.

The purpose of former U.C.C. § 2–326(3) and now revised U.C.C. §§ 9–102(a)(20) & 9–319(a) is to protect general creditors of the consignee from claims of consignors that have undisclosed consignment arrangements with the consignee that create secret liens on the inventory. *Thornton–Blue Pac.*, 62 Cal.Rptr.2d at 95; *Haas*, 235 Cal.Rptr. at 202–03 (". . . [T]he agreement between the consignor and consignee cannot operate to grant the consignor an unpublicized, nonpossessory lien.") Under these U.C.C. provisions, the court is not concerned with the rights between the consignor and consignee, but rather solely with the rights of the third party creditors of the consignee. *See Minor*, 278 Cal.Rptr. at 564; *Thornton–Blue Pac.*, 62 Cal.Rptr.2d at 95. Creditors of the consignee need not demonstrate actual reliance on the goods or the lack of a financing statement in extending credit in order to benefit from the protections of these provisions. *Haas*, 235 Cal.Rptr. at 204.[36]

---

**34.** *See also, In re State St. Auto Sales*, 81 B.R. at 216, 218 (goods held on consignment comprising only about 20% of total inventory deemed insufficient to consider debtor as being substantially engaged in selling the goods of others); *In re Arthur A. Everts Co.*, 35 B.R. at 708–09 (consignee in jewelry business held not primarily engaged in selling goods where only $75,000.00 of the $690,000.00 or 10.8% worth of inventory was held on consignment).

**35.** *See also: In re BRI, Corp.*, 88 B.R. at 75 (holding consignor must show that most of consignee's creditors knew of consignment practice and, must establish number of such creditors); *In re State St. Auto Sales*, 81 B.R.

at ·218 (consignor must establish number of creditors in number not amount of claims); *In re Wedlo Holdings*, 248 B.R. at 341 (same).

**36.** However, some courts have held that an individual creditor of the consignee with actual knowledge of the consignment relationship does not need protection from potential secret liens. *See GBS Meat Industry Pty. Ltd. v. Kress–Dobkin Co., Inc.*, 474 F.Supp. 1357, 1363 (W.D.Pa.1979) (creditor with knowledge of consignment had no right under U.C.C. § 2–326 to proceeds of inventory sale); *Eurpac Svc. Inc. v. Republic Acceptance Corp.*, 37 P.3d 447, 450–51 (Colo.Ct.App.2000).

*Valley is the Subject of the Test:*

The parties agree that in order for the Objecting Vendors to demonstrate that their interests in the Contested Inventory are preserved under either provision, it must be established that the "person conducting the business" under former U.C.C. § 2–326(3) or the purported "merchant" under revised U.C.C. § 9–102(a)(20) is generally known by his or her creditors to be substantially engaged in selling the goods of others. *See* Cal. Com.Code. Former § 2326 and Revised § 9102(a)(20). The parties disagree, however, as to whether Valley or its wholly owned DNA division should be the subject of this test. The Objecting Vendors assert that DNA, as the consignee under the Distribution Agreements, is the "person conducting business" or the purported "merchant" and therefore, they need only establish that DNA was generally known by DNA's creditors to be substantially engaged in selling the goods of others to avoid the application of these U.C.C. provisions.

Tracing the definitions of "person" and "merchant", it is clear that the subject of the test must be an entity, whether legal or commercial.[37] The Objecting Vendors concede this under their proposed analysis of the term "merchant" and by means of their contention that DNA, as a "commercial entity"[38], is the proper merchant or person for the test[39]. The Debtor counters that DNA, as an unincorporated division of Valley, is not a legal entity, and thus cannot be the subject of the test since it is incapable of having creditors of its own for purposes of the "general knowledge" prong of the test. Instead, the Debtor asserts that the Objecting Vendors must establish that Valley was generally known by Valley's creditors to be substantially engaged in selling the goods of others. The Objecting Vendors respond that DNA should be treated as an independent "commercial entity" by this Court since, among other things, DNA functioned as an independent entity, was believed to be a

I need not attempt to determine whether California follows this actual knowledge exception to the test. The priority contest in this case is between the Objecting Vendors and the Debtor in Possession who pursuant to 11 U.S.C. §§ 544(a) & 1107(a) is a creditor *without* actual knowledge.

37. Revised U.C.C. § 9–102(a)(20) refers to a "merchant". Merchant is defined as "a *person* who deals in goods of the kind or otherwise holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction..." *See* Ann. Cal. Com.Code § 2104(1) (West 2002)(emphasis added).
Former U.C.C. § 2–326(3) also refers to a consignee as a *"person* {that} maintains a place of business at which he deals in goods of the kind involved, under a name other than the person making the delivery." *See* Ann. Cal. Com.Code § 2326(3)(West 2001)(text effective until July 01, 2001)(emphasis added). The U.C.C. defines *person* as "an individual or an *organization*." *See* Ann. Cal. Com.Code § 1201(30) (West 2002) (emphasis added).

The U.C.C. defines an organization to include "a corporation...or any other *legal or commercial entity.*" *See* Ann. Cal. Com.Code § 1201(28) (West 2002)(emphasis added).

38. It seems from the context of this assertion that the Objecting Vendors believe that this is a lesser standard than "legal entity". However, they have offered no support for this proposition. (Obj. to Debtor's FOF at 8.)

39. Although I find that under revised U.C.C. § 9–102(a)(20) the Objecting Vendors must show that the DNA is not a merchant in order to prevail, they must initially convince me that DNA is an entity that could form its own contracts without binding Valley. Otherwise, the Objecting Vendors' relationship is with Valley and Valley is the proper subject of the revised U.C.C. § 9–102(a)(20) test of merchant status. The same holds true under former U.C.C. § 2–326(3) where the Objecting Vendors must demonstrate that DNA was a "person" that could be subject to the Generally Known/ Substantially Engaged test.

separate entity by its employees, and both Valley and DNA held DNA out as a stand alone entity capable of independent existence.

 I find the question of whether DNA is an entity to be the threshold, and I believe dispositive, issue in determining whether the Objecting Vendors may assert their ownership rights to the Contested Inventory against the Debtor in Possession in a 11 U.S.C. § 544(a) action. Although the Debtor argues that DNA must be a "legal entity" and the Objecting Vendors argue that DNA need only be a "commercial entity", I find that the core question is whether DNA is an entity at all. An entity[40] must have a legal identity apart from its members, here the purported officers and employees of DNA. It follows that it must also have a legal identity apart from its owner, here Valley. I find that as an unincorporated division of Valley, DNA did not have a legal identity independent from Valley.

Nor does California state law, which governs the contract, or Delaware state law, which governs Valley's corporate existence, organization and governance, recognize a separate legal existence for DNA. I also find no reason to bifurcate the business lines[41] nor any viable reliance argument that would justify treating DNA as an entity in contravention of the policies underlying former U.C.C. § 2–326 or revised U.C.C. § 9–102(a)(20).

 In order to have its own creditors, DNA, as an unincorporated division of Valley, would have to be an entity which has both the capacity to contract and the capacity to sue or be sued in order to enforce obligations. The capacity to sue or be sued is a prerequisite to being a party in an action at state or federal law. California law, which governs the Distribution Agreements, grants a legal identity to unincorporated associations[42], grants them the capacity to contract[43] and grants them

**40.** Black's law dictionary defines **entity** as: "An organization (such as a business or a governmental unit) that has a legal identity apart from its members." Black's Law Dictionary (7th ed.1999)

**41.** The Objecting Vendors have cited the case of *Newhall v. Haines*, 10 B.R. 1019 (D.Mont. 1981) as authority to bifurcate Valley's business lines for the purposes of the Generally Known/Substantially Engaged test. The *Newhall* court based its decision that U.C.C. § 2–326 did not apply on its finding that the consigned goods differed in nature from the regular inventory of the store. *See Newhall*, 10 B.R. at 1023. Here the consigned goods are the same, and in fact, are indistinguishable from the terms inventory held by Valley and DNA. Thus, I find *Newhall* inapplicable.

**42.** In Title 3 of the California Corporate Code, Unincorporated Associations, an unincorporated association is defined as "any partnership or other unincorporated organization of two or more persons whether organized for profit or not, but does not include a government or governmental subdivision or agen-

cy." Ann. Cal.Corp.Code § 24000(a) (West 2002)

California case law defines an "association" as "an unincorporated organization composed of a body of men partaking in general form and mode of procedure of the characteristics of a corporation…" *Law v. Crist*, 41 Cal.App.2d 862, 865, 107 P.2d 953 (1940).

**43.** California law makes an unincorporated association liable "to a person who is not a member of the association for an act or omission of the association; and for the act or omission of its officer, agent or employee acting within the scope of his office, agency, or employment, to the same extent as if the association were a natural person." Ann. Cal. Corp.Code § 24001 (West 2002).

Unincorporated associations have been authorized to enter into contracts and thus incur liability on behalf of the association. Ann. Corp Code § 24001 (West 2002), Law Revision and Comment 1967 Addition. *citing* Cal. Com Code § 1201(29) (defining a party as person); § 1201(30) (defining person to include an organization) and § 1201(28)(defining organization to include an association).

the capacity to sue and be sued in order to enforce obligations[44]. Delaware law also recognizes unincorporated associations and grants them the capacity to sue or be sued.[45] Even if an unincorporated association lacks the capacity to be a party in an action at state law, it may still be a party in an adversary proceeding in Bankruptcy under Fed.R.Civ.P. 17(b)(1)[46] provided that it fits within the narrow federal definition of an unincorporated association. *Equal Employment Opportunity Commission v. St. Francis Xavier Parochial School*, 77 F.Supp.2d 71, 76–77 (D.D.C.1999)(listing cases setting forth the federal definition of unincorporated association). Thus it would seem that an unincorporated entity could have the capacity to have creditors.

DNA, however, is not an unincorporated association. While it is undisputed that DNA itself is not incorporated, this does not mean that DNA is not subject to a corporate charter. As a wholly owned division of Valley, DNA operates under the Valley charter and enjoys no separate legal existence from Valley. *See St. Francis*, 77 F.Supp.2d at 77 ("Although the

division is not separately incorporated, it is still governed by the terms of the corporate charter and still enjoys corporate status because it is a unit of the larger corporation."); *Mayer Pollock Steel Corp. v. Warner*, Docket No. 350,1995, appealed from Superior CA 91C–02–014, 1996 WL 145791 (Del.1996)(holding that a wholly owned unincorporated division had no separate legal existence from its owner corporation).[47]

 I have found no other basis in law that would support a finding that DNA should be treated as a separate legal entity from Valley. The Objecting Vendors argue that DNA was an entity during the time it existed as a joint venture and should still be considered to be an entity in its capacity as a wholly owned division of Valley. (*See* Obj. to Debtor's FOF, Doc. 573 at 10.) In support, they assert that there has been essentially no change in DNA's operations since Valley assumed full ownership and the only change was one of corporate structure. *Id.* That change in corporate structure however, is conclusive to the issue of DNA's ability to

A contract is defined as "the total legal obligation that results from the parties' agreement as affected by this code and any other applicable rules of law." Ann. Cal. Com. Code § 1201(11)(West 2002).

44. "A partnership or other unincorporated association, whether organized for profit or not, may sue and be sued in the name it has assumed or by which it is known." Ann. Cal.Civ.Proc.Code § 369.5(a)(West 2002)

45. An unincorporated association may do business in the state of Delaware upon proper registration (6 Del. C. § 3104), sue and be sued in its common name (10 Del. C. § 3904), and is subject to writs of attachment to enforce judgments (10 Del.C. § 3504).

46. Fed. R. Bank. P. 7017 makes Fed.R.Civ.P. 17(b) applicable to adversary proceedings in bankruptcy.

47. In the cited case, a merger had taken place between separate corporations which eliminated their separate legal existence and left only an owner corporation and a wholly owned division. *This unpublished decision* reversed the lower court which had found that although the separate legal existence of the two corporations had been eliminated, the two entities were sufficiently distinct that the owner corporation would not be considered the employer of a division employee. This in effect would have allowed the division employee to bring a tort suit against the owner corporation as if it were not his employer despite 19 *Del C.* § 2304 which prescribed workman's compensation as the exclusive remedy available to employees. The Delaware Supreme Court held that the lower court had committed reversible error in not giving effect to the merger of the two corporations.

be an entity once the joint venture was absorbed by Valley. The law of Delaware, the state governing Valley's corporate existence and organization, does not recognize DNA as a separate legal entity merely because it was previously a separate entity in its former existence as a joint venture. The buyout of the venture partnership by Valley extinguished the independent existence of DNA as a legal entity and it was subsumed into the corporate body of Valley making the two entities one for all purposes. *See Mayer Pollock* at \*1–\*2 [48] (finding legal error had been committed when a lower court did not give effect to a merger between two formerly separate legal entities). Similarly, California law does not recognize DNA as a separate legal entity from Valley merely because Valley continued to use the DNA name and to act under that name [49]. A corporation may use names other than the one in its charter and yet, it is still not more than one entity. *See Pinkerton's, Inc. v. Superior Court*, 49 Cal.App.4th 1342, 57 Cal. Rptr.2d 356, 360 (1996)("Doing business under another name does not create an entity distinct from the person operating the business. The business name is a fiction, and so too is any implication that the business is a legal entity separate from its owner."); *Duval v. Midwest Auto City, Inc.*, 425 F.Supp. 1381, 1387 (D.Neb. 1977)("The individual who does business as a sole proprietor under one or several names remains one person, personally liable for all his obligations. So also with a corporation which uses more than one name.") [50] While a suit may be brought under the fictitious business name in California, the only entity with capacity to be sued is the corporation itself. *Pinkerton's*, 57 Cal.Rptr.2d at 361 (Cal.Civ.Proc.Code § 474)(finding that no legal action could proceed against the fictitious business name after the legal entity, the corporation using that name, had been dismissed from the suit).

Therefore, I must conclude that DNA was not an entity and cannot be the "merchant" or "person" who is the subject of the Generally Known/ Substantially Engaged test. Nor was DNA capable of having creditors of its own because as an unincorporated division of Valley, DNA had no legal existence or independent legal identity apart from Valley, it could not bind itself in contract without binding Valley, and it had no capacity to be a party, on it's own, in any legal proceeding at state or federal law.

I am not persuaded by the Objecting Vendors' arguments that the Court should treat DNA as an entity for the purposes of the Generally Known/ Substantially Related test because it functioned as an independent entity or was held out as an independent entity. The Objecting Vendors have offered no case to support the proposition that these assertions, even if true,

---

**48.** Although decided by the Delaware Supreme Court under a Pennsylvania statute governing corporate merger, the court cited to a similar Delaware provision, reflecting the court's view that the corporate form chosen by a duly organized corporation is to be respected. Since there have been no arguments made that the joint venture was not properly absorbed into Valley under Delaware law, this case applies without further analysis.

**49.** In the case of a corporation, a fictitious business name is defined at California law as "any name other than the corporate name stated in its articles of incorporation". Ann. Cal. Bus. & Prof.Code § 17900(a)(3)(West 2002).

**50.** This case was incorporated into California law by *Providence Washington Ins. Co. v. Valley Forge Ins. Co.*, 42 Cal.App.4th 1194, 50 Cal.Rptr.2d 192, 194 (1996) and *Pinkerton's Inc. v. Superior Court*, 49 Cal.App.4th 1342, 57 Cal.Rptr.2d 356, 360 (1997).

could form a basis for finding that DNA was an entity capable of having creditors. The evidence presented has not proven the Objecting Vendors' assertions.

First, the Objecting Vendors have not demonstrated that DNA operated independently from Valley. I find Mr. Garrett's testimony regarding the twelve functions of a distributor discussed above to be compelling in this regard. DNA was in effect merely a sales and marketing arm of Valley for a specific target group of independent labels. DNA could not authorize payment of its own bills. Nor did it handle its own customer service, IT, credit and collections, warehousing, distribution, human resources,etc. I find the Objecting Vendors' assertion that DNA could have outsourced these functions to be unpersuasive because nothing in the record indicates that DNA would have been free to make such a decision without Valley's approval. The fact that Valley created separate financial statements for DNA and charged overhead expenses to that profit and loss statement is also not conclusive of DNA's independence. Similar situations exist in many large companies. It is merely indicative of good business judgement to design accounting systems that assist managers in identifying profitable and unprofitable areas of the business and it is not conclusive of independent existence.

Second, the Objecting Vendors have not effectively demonstrated that DNA was held out as an independent entity to the public such that the Objecting Vendors or other "DNA creditors" could not be aware that DNA was part of Valley. Other than the DNA Vendors, no testimony was offered that a significant number of other "DNA creditors" existed or what their numbers might be. Any Objecting Vendor that signed a form such as the one attached as Exhibit B to the Rotten Records, Inc. Distribution Agreement was clearly on notice that (1) they were making an agreement with Valley[51] and (2) that Valley's creditors might in the absence of such letter, believe the consigned inventory to be property of Valley. (CIL Ex.1.) The DNA Marketing Brochure had only limited distribution and clearly did not represent that DNA was an independent entity from Valley[52]. It is also evident from the Distribution Agreements that Valley and DNA shared some close connection worthy of inquiry[53].

**51.** The letter reads "Reference is made to the existing consignment arrangements between [Rotten Records, Inc.] and Valley Media, Inc., f/k/a Valley Record Distributors, Inc. (Valley) pursuant to which we from time to time sell and/or deliver goods on consignment (the Consigned Goods) to Valley." (CIL Ex. 1 at Ex. B.)

**52.** The Marketing Brochure that Valley prepared for the sale of DNA acknowledges that DNA utilizes Valley's product fulfillment services as well as accounting, collections, customer service and human resource functions. (RAS Ex. 34 at 6 & 7.) Not one of the Investment Scenarios states that DNA could operate as a stand-alone without financing and either continuing support service from Valley or affiliating itself with another distributor or label or both. (*Id.* at 9.)

**53.** At a minimum the Distribution Agreements submitted as exhibits indicate that Valley could be appointed a sub-dealer (DA ¶ 5.2), all correspondence was sent care of Valley Media (DA ¶ 14.7) and any "shrink wrapping" would be done at prices in effect at Valley Media (DA ¶ 3.2(b)). For Objecting Vendors switching from a terms relationship with Valley to a consignment relationship with DNA, the agreements indicated that the inventory would be moved "from Valley to Distributor {DNA} in Valley's computer system." (CIL Ex. # 1,2,6 at ¶ 4.3); (CIL Ex.# 3 at ¶ 4.4). In other agreements, the Objecting Vendors made the agreement with "DNA, a division of Valley Media, Inc., a Delaware corporation ('Valley')". (CIL Ex. # 4,5, & 7; Ras Ex. # 3,4,8,9,10; D3 Ex.# 1.)

Finally, the Objecting Vendors' argument that DNA was "held out" as an independent entity and Valley should be bound by this for the purposes of the test is contrary to the policy and purposes behind former U.C.C. § 2–326 and now revised §§ 9–102(a)(20) & 9–319(a). These sections exist to protect creditors of the consignee from hidden liens, not the consignors' rights to goods in the possession of a consignee. *See In re Wicaco Mach. Corp,* 49 B.R. at 343; *In re Eurpac,* 37 P.3d at 450. As noted by the California Appellate court:

> " 'We are not concerned in these cases with the rights between owners and dealers but with the rights of third parties. Rights of third parties may be affected by private arrangements not available to them, but they should not be completely controlled by such terms. Courts should be principally concerned with the reasonable expectations of third parties. Determining the rights of third parties based on ostensible ownership rather than on actual ownership has long been a part of our law. This principle, expressed elsewhere in the Code [fn. omitted.] should apply to these types of cases. We find this position particularly compelling because the owner can easily protect himself by filing a financing statement.' "

*Minor,* 278 Cal.Rptr. at 564 (2 White and Summers, Uniform Commercial Code (3d 1988) § 23–5, p. 256)(all changes made in *Minor* ). Thus, Valley's actions regarding DNA and the Objecting Vendors pre-bankruptcy are of no import to the application of the Generally Known/Substantially Engaged test which only focuses on the reasonable expectations of Valley's non-consigning creditors. It was the Objecting Vendors' duty to inquire about the party that they were dealing with and to make appropriate inquiries about the corporate status of DNA and its affiliation with Valley. To the extent that the Objecting Vendors felt that they were misled as to who they contracted with or what that relationship was, there are other remedies at law adequate to that purpose. Those remedies, however, have no effect on the inquiry at hand.

*Objecting Vendors Do Not Meet Their Evidentiary Burden:*

Therefore, the burden [54] on the Objecting Vendors was to establish that Valley was generally known by Valley's creditors to be substantially engaged in selling the goods of others. I find that the Objecting Vendors have not met this burden nor can they. The Objecting Vendors have not demonstrated that a majority of Valley's creditors in number knew that Valley was substantially engaged in selling the goods of others. All the Objecting Vendors have shown is that the Consignment Vendors and Congress knew that Valley was engaged in consignment sales. Some unproven number of new Terms Vendors and recipients of the Marketing Brochures, if they were Valley creditors, may also have known. However, there was no evidence

---

**54.** Under former U.C.C. § 2–326(3) it is clear that the Objecting Vendors have the burden of establishing that the Generally Known/Substantially Engaged test has been met to rebut the presumption that the consignment was a "sale or return" arrangement. However, under revised U.C.C. § 9–102(a)(2) the party seeking to avoid the consignor's interest must first prove that the arrangement at issue is indeed a consignment by showing that the deliveree was a merchant. Thus, under revised U.C.C. § 9–102(a)(2), it seems that the burden would be on the Debtor to demonstrate that Valley was *not* generally known by its creditors to be substantially engaged in the selling of the goods of others. *See* notes 26 & 33, *supra.* The Debtor in Possession has met this burden. I am satisfied, therefore, that the outcome in this case remains the same under either provision.

offered as to the actual knowledge of the vast majority of Valley's creditors including equipment vendors, travel agents, and insurance carriers, etc. Case law also suggests that the Consignment Vendors are not the creditors who should be protected under the applicable U.C.C. provisions and thus should be excluded from the calculation. *See In re BRI Corp.*, 88 B.R. at 75. Even if the Objecting Vendors could have demonstrated that a majority of Valley's creditors knew of the consignment sales, they could not and did not show that Valley was actually substantially engaged in such sales. *See In re State St. Auto Sales*, 81 B.R. at 218. For the period of time evidenced by the Valley Media Inventory Analysis (RAS Ex. 19), the percentage of the value of consigned inventory to total inventory for Valley was never more than 17.03% which is below the 20% threshold set by case law on the issue. *See In re Wedlo Holdings*, 248 B.R. at 342.

I conclude that the Objecting Vendors have not met their burden on either prong of the test. Therefore former U.C.C. § 2–326(3) or revised U.C.C. §§ 9–102(a)(20) & 9–319(a) would apply if a creditor of Valley seeks to recover against the Contested Inventory.

*Debtor's § 544 Powers:*

■■■ The Objecting Vendors did not perfect their interest in the Contested Inventory by filing and do not qualify for any other exception to the application of former U.C.C. § 2–326(3) or revised U.C.C. §§ 9–102(a)(20) & 9–319(a). Thus, the Objecting Vendors may not assert ownership rights in the Contested Inventory against the Debtor in Possession as a hypothetical lien creditor of Valley pursuant to 11 U.S.C. §§ 544(a) [55] & 1107(a) [56]. *See In re BRI Corp.*, 88 B.R. at 74. No knowledge of the pre-petition debtor regarding the consignments is imputed to the Debtor in Possession. *See* 11 U.S.C. § 544; *High-Line Aviation*, 149 B.R. at 739 (actual knowledge of the consignment is not imputed to the bankruptcy trustee under 11 U.S.C. § 544(a)(1)); 5 *Collier on Bankruptcy*, ¶ 544.02 at 544–4 & 5, ¶ 544.03 at 544–7 & 8 (15th ed. rev.2001). Therefore, while a consignor that failed to protect its interest under former U.C.C. § 2–326(3) or revised U.C.C. § 9–102(a)(20) might prevail over a secured creditor of the consignee who had actual knowledge of the consignment, that consignor will not prevail over a trustee exercising its powers pursuant to 11 U.S.C. § 544(a). *See High-Line Aviation*, 149 B.R. at 739.

A judicial lien creditor is a creditor of the consignee Valley that may invoke former U.C.C. § 2–326(3) under California law [57]. *See Haas*, 235 Cal.Rptr. at 204.

---

**55.** In relevant part, 11 U.S.C. § 544 reads: "(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—
 (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists; . . ."

**56.** In relevant part, 11 U.S.C. § 1107 reads: "(a) Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, except the duties specified in sections 1106(a)(2), (3), and (4) of this title, of a trustee serving in a case under this chapter."

**57.** Since the intent of revised U.C.C. §§ 9–102(a)(20) and 9–319(a) are the same as former § 2–326(3), the holding applies to these sections as well.

Since the Objecting Vendors have not proven that Valley was generally known by its creditors to be substantially engaged in selling the goods of others, a judicial lien creditor may attach consigned goods in the possession of Valley under former U.C.C. § 2–326(3) or revised U.C.C. § 9–319(a). The Debtor must bring an adversary proceeding to complete the 11 U.S.C. § 544(a) action. However, I find that the Debtor may sell the Contested Inventory since its interest in that inventory is superior to the Objecting Vendors' interests.

 Therefore, I must conclude that the Objecting Vendors' may not obtain relief from the stay to recover the Contested Inventory. *See In re Tristar Automotive Group*, 141 B.R. 41, 44 (Bankr.S.D.N.Y. 1992) (a consignor that neither files nor proves that the consignee was generally known to be substantially engaged in selling the goods of others is treated as a general unsecured creditor and as such is not entitled to relief from the automatic stay) The Objecting Vendors will have a pre-petition unsecured claim[58] against the

estate for the invoice price[59] of the Contested Inventory. *See In re BRI Corp.*, 88 B.R. at 75 (holding that the consignor is left with an unsecured claim against the estate subordinated to the rights of the trustee under 11 U.S.C. § 544(a)(1).)[60]

## 2. COPYRIGHT AND LICENSES:

 The Objecting Vendors have asserted that any sale of the Contested Inventory will violate federal copyright law because it will be made without the requisite authority of the copyright owners. Although the Distribution Agreements clearly gave Valley the right to distribute consigned inventory delivered into its possession pursuant to those agreements, the Objecting Vendors argue that this authority has terminated and may not be revived except with their express permission.

The Objecting Vendors' arguments are as follows: 1)The Distribution Agreements and the licenses they contain have already been terminated; 2) if not terminated, the Distribution Agreements are executory

---

58. Courts differ in their view of whether the 11 U.S.C. § 544(a)(1) action when a consignor has failed to protect its interest under former U.C.C. § 2–326(3) should be reviewed under a priority of interest analysis or a property of the estate analysis. *See* Hillinger, *The Treatment of Consignments in Bankruptcy*, §§ 1,2, & 3, 6 Bankr.Dev.J. 73, 92–103 (1989).
However, courts concur that the consignor holds an unsecured claim against the Debtor as a result of the 11 U.S.C. § 544(a)(1) action, regardless of whether they consider that the inventory has become property of the estate *In re Auclair*, 131 B.R. 185, 187 (Bankr. M.D.Ala.1991), that the trustee's rights are superior to the consignor's rights in the inventory *In re BRI, Corp.*, 88 B.R. 71,75 (Bankr.E.D.Pa.1988) or that the trustee has set aside or avoided the consignor's unperfected security interest *In Matter of High–Line Aviation, Inc.*, 149 B.R. 730, 732 & 739 (Bankr.N.D.Ga.1992) as a result of such action.

59. *See* CIL Ex. 1 at Ex. A (listing prices to be paid by distributor); CIL Ex. 2 at Ex. A (same).

60. *See also, In re Russell*, 254 B.R. 138, 144 (Bankr.W.D.Va.2000)(holding that a bankruptcy trustee's rights in consigned inventory are superior to rights of any consignors who have not filed financing statements when those consignors do not prove the generally known/substantially engaged exception to former UCC § 2–326(3)); *In Matter of High–Line Aviation, Inc.*, 149 B.R. 730, 738 (Bankr. N.D.Ga.1992) (holding that under 11 U.S.C. § 544 a trustee may avoid a consignor's interest that is not protected under former UCC § 2–326 at the time the consignee files bankruptcy); *In re Auclair*, 131 B.R. 185, 187 (Bankr.M.D.Ala.1991)(consignor has an unsecured claim for inventory it failed to protect under former U.C.C. 2–326(3) exceptions and may file a proof of claim in the case).

contracts and the licenses they contain to distribute the Contested Inventory and use other intellectual property may not be exercised by the Debtor unless the Debtor assumes the Distribution Agreements; 3) the Debtor may not assume or assign the Distribution Agreement licenses under Third Circuit case law regarding § 365(c)(1) unless they obtain the permission of the Objecting Vendors; and 4) even if the Debtor still has permission to sell, the Auction Sale exceeds the scope of authority to distribute granted by the license.

The Debtor in turn asserts that it need not assume the Distributions Agreements because: 1)Valley has title to the Contested Inventory and thus under the first sale doctrine, the Debtor does not need authorization from the copyright holders to sell[61]; 2) the Distribution Agreements were not terminated according to their terms prior to the petition date and are still in effect; 3) the Objecting Vendors'

right to authorize distribution was exhausted upon delivery of the Contested Inventory[62]; 4) the right to sell survives the termination of agreements[63]; and 5) the Auction Sale will not exceed the scope of the licenses. Rather than addressing each argument, I will only address such arguments of parties as are necessary to determine the Debtor's right to distribute for the purposes of the Auction Sale.

 Copyright in a work protected by federal copyright law vests initially in the author of the work. 17 U.S.C. § 201(a). Copyright owners possess certain exclusive rights, including the right to distribute or authorize the distribution of copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership[64]. 17 U.S.C. § 106(3). Once a copyright owner consents to the sale of particular copies or phonorecords, the distribution right is terminated with regard to those particular copies or phonorecords. 17 U.S.C. § 109(a)[65]; *See* 2 Nim-

---

**61.** It is clear from the discussion in section 1 of this opinion regarding the effect of former U.C.C. § 2–326(3) and revised U.C.C. § 9–319(a) on title, *supra*, that Valley did not have title to the Contested Inventory pre-petition. I find that I need not reach the issue of whether an involuntary transfer of title under § 544(a) in combination with former U.C.C. § 2–326(3) or revised U.C.C. § 9–319(a) is either possible or would effect a first sale. *See Platt & Munk Co. v. Playmore, Inc.*, 315 F.2d 847, 854 (2d Cir.1963) (recognizing in dicta that a first sale may result from involuntary transfer of title through judicial sale or court compelled assignment if the copyright holder received his reward for the use of the article and that the right holder may be estopped from denying authorization of the transfer by means of presumed consent to the rights and remedies applicable to goods in the course of trade); *United States v. Atherton*, 561 F.2d 747, 750 (9th Cir.1977)(first sale not limited to voluntary sale).

**62.** I need not address this argument since I find that the Distribution Agreements have not been terminated.

**63.** This is clearly not the case. The authorization to sell was limited to the duration of the Distribution Agreements. *See* DA ¶ 2 (limiting grant of distribution rights to term of agreement); DA ¶ 9.2 (limiting use of materials to term of the agreement).

**64.** 17 U.S.C. § 106(3) reads in relevant part:

"Subject to sections 107 through 121, the owner of a copyright under this title has the exclusive rights to do and to authorize any of the following:

...(3)to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending."

**65.** 17 U.S.C § 109(a) reads in relevant part:

"Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord..."

mer on Copyright § 8.12[B][1] at 8–150.6 (2001) After the first sale of the copyrighted item "lawfully made under this title", the purchaser and subsequent purchasers are an "owner" of that item under 17 U.S.C. 109(a). *Quality King Distributors, Inc. v. L'anza Research Int'l., Inc.,* 523 U.S. 135, 145, 118 S.Ct. 1125, 1130, 140 L.Ed.2d 254 (1998). This is the so called first sale doctrine embodied in 17 U.S.C. § 109(a) and prevents the copyright owner from controlling the future transfer of a particular copy once its material ownership has been transferred. *Sebastian Int'l, Inc. v. Consumer Contacts Ltd.,* 847 F.2d 1093, 1096 (3d Cir.1988). An owner of a lawfully made copy, or one authorized by such owner, may sell that copy without any further permission of the copyright owner. See 17 U.S.C. § 109(a); *Quality King,* 523 U.S. at 146–47, 118 S.Ct. at 1131. Ownership of the copyright is distinct from ownership of any material object in which the work is embodied, such as the Contested Inventory. 17 U.S.C. § 202 [66]. Therefore, mere legal or authorized possession, such as in the case of a bailee or consignee, does not grant the requisite authority to make the first sale and will not protect the bailee or subsequent sellers from infringement actions. *Quality King,* 523 U.S. at 146–47, 118 S.Ct. at 1131; *Little Brown & Co. v. American Paper Recycling Corp.,* 824 F.Supp. 11, 17 (D.Mass.1993);.

▇▇▇▇▇▇ Permission to sell is granted by the copyright owner to other parties via licenses. An exclusive license to distribute grants the holder of that license all the rights and remedies of the copyright owner pertaining to distribution. 17 U.S.C. § 201(d)(2). Exclusive licenses grant the licensee a property right in the copyright that is freely transferrable and the licensor is precluded from transferring those rights again to someone else. *In re Golden Books Family Entertainment, Inc.,* 269 B.R. 300, 309 (Bankr.D.Del.2001). The Objecting Vendors have such licenses from third party copyright holders whose copyrighted work is embodied in the Contested Inventory. (DA ¶¶ 7.1(a)-(e), 9.1); (Tr. 2/26/02 Lemasters, 34:19–35:24, 42:5–42:19; Dickinson 60:12–18); (CIL Ex. 8). A nonexclusive license of rights by a copyright owner to another party is not assignable by that party without the permission of the copyright holder under federal copyright law since the license represents only a personal and not a property interest in the copyright. *In re Golden Books,* 269 B.R. at 309. The Third Circuit follows the general rule that intellectual property licenses, including copyright licenses, are executory contracts within the meaning of 11 U.S.C. § 365(c) under the Countryman test [67]. *In re Golden Books,* 269 B.R. at 308; *In re Access Beyond Tech., Inc.,* 237 B.R. 32, 43 (Bankr.D.Del.1999). An executory contract may not be assumed by a debtor in possession if it may not be assigned under applicable non-bankruptcy law, such as federal copyright law. *See In the Matter of West Electronics, Inc.,* 852 F.2d 79, 82–

**66.** 17 U.S.C. § 202 reads in relevant part:

"Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied. Transfer of ownership of any material object, including the copy or phonorecord in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object; . . ."

**67.** The Countryman test is applied in the Third Circuit to determine whether a contract is executory. Under this test, a contract is executory when the obligations of both the bankrupt and the other party are so far underperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other. *In re Columbia Gas System, Inc.,* 50 F.3d 233, 244 n. 20 (3d Cir.1995); *In re Golden Books,* 269 B.R. at 308.

83 (3d Cir.1988); *In re Golden Books,* 269 B.R. at 308–309; *In re Access Beyond Tech., Inc.,* 237 B.R. at 48. Since non-exclusive licenses may not be assigned by the licensee under applicable copyright law, they may not be assumed by the debtor in possession. *See In re Golden Books,* 269 B.R. at 308–309.

■■■■ The Debtor-in Possession must have the requisite authority to sell the Contested Inventory or become an infringer. If the first sale of the phonorecords or copies in which the copyrights are fixed is transacted without the permission of the copyright holder or its exclusive licensee, that seller and all subsequent sellers are liable for infringement. *Platt & Munk Co. v. Playmore, Inc.,* 315 F.2d 847, 852 (2d Cir.1963)(holding that the lack of an authorized first sale is a defect in title making all subsequent sellers liable for infringement); *American Int'l Pictures, Inc. v. Foreman,* 576 F.2d 661, 664 (5th Cir.1978)(holding that even subsequent purchasers without knowledge of the unauthorized first sale are liable for infringement if the copy was not the subject of an authorized first sale). In other words, an owner as contemplated in 17 U.S.C. § 109(a) cannot be created by an unauthorized first sale. Once a lawfully made copy is sold with the requisite permission, a 17 U.S.C. § 109(a) owner is created, the right to control distribution is cut-off and no subsequent seller can be held liable for infringement. *See* 17 U.S.C. § 109(a); *Quality King,* 523 U.S. at 145, 118 S.Ct. at 1130.

There are three copyright owners in this case: 1) the authors of the musical compositions ("Music Writers") from whom the Objecting Vendors or the Artists (defined below) have, or should have, obtained me-

chanical licenses to record their compositions[68], 2) the copyrights of the those who recorded and or produced the recordings (the "Artists"), and 3) the Objecting Vendors' own copyright in recordings which they produced themselves (collectively, the "Copyright Owners"). The purpose of the Distribution Agreement was to allow Valley to sell the consigned inventory for the Objecting Vendors. (Tr. 2/26/02 Lemasters 42:13–19, Dickinson 60:12–18.) The Objecting Vendors warranted in the Distribution Agreements that they had obtained the necessary authority from the Music Writers and Artists to allow Valley to distribute the Contested Inventory without infringing the rights of the Music Writers or Artists. (DA ¶¶ 7.1(a)-(e),9.1); (Tr. 2/26/02 Lemasters, 34:19–35:24, 42:5–42:19; Dickinson 60:12–18); (CIL Ex. 8) The Objecting Vendors also granted Valley their own permission to distribute the Contested Inventory. (DA ¶¶ 2,9.2.) Thus the Distribution Agreements granted Valley authority to sell the Contested Inventory without infringing on the distribution rights of any of the Copyright Owners, including the Objecting Vendors rights. In other words, Valley was authorized by the Objecting Vendors as copyright owners and exclusive licensees of the Artists and the holder of mechanical licenses from the Music Writers to sell the phonorecords that embodied those copyrighted works. The individuals and entities purchasing from Valley obtained title to lawfully made phonorecords and became 17 U.S.C. § 109(a) owners who could make subsequent sales without infringement. Neither the Objecting Vendors (unless they purchased CD's from Artists) nor Valley were 17 U.S.C. § 109(a) owners since neither could sell without the licenses they held. The question before me is whether Valley's

---

**68.** In the event that the Objecting Vendors do not make the requisite mechanical license payments, debtor has made an agreement with The Harry Fox Agency, which represents most of the Music Writers, to pay the royalties. *See* Auction Order (Doc. 287).

authority to sell the Contested Inventory still exists in bankruptcy under the executory, non-exclusive licenses in the Distribution Agreements. I find that it does.

*Distribution Agreements Were Not Terminated:*

■ As an initial matter, I find that the Distribution Agreements have not been terminated. While Valley may have breached the Distribution Agreements prepetition by failing to make the October 2001 payments to the Objecting Vendors, none of the Objecting Vendors have demonstrated that they successfully terminated the Distribution Agreements prepetition according to the termination provisions in those agreements[69]. (DA ¶¶ 12, 13.1.) The automatic stay prevented the Objecting Vendors from terminating the agreements post-petition, despite any post-petition breach, without first seeking relief from the stay. 11 U.S.C. § 362. The Objecting Vendors have not moved for relief on this basis in their Relief Motions[70]. Nor were the licenses in the Distribution Agreement terminated automatically by any breach. The Distribution Agreements specifically deal with the consequences of a material breach of any kind and the methods for terminating the agreements, and thus the licenses they contain, in ¶ 13.1 entitled "Events of Termination". (DA ¶ 13.1.)

*Debtor in possession succeeds to rights in executory contracts:*

■ The Objecting Vendors' assertion that the licenses terminated when the

pre-petition Debtor ceased to exist and was replaced by the Debtor in Possession is similarly unpersuasive. The debtor and the debtor in possession are indeed considered to be two different entities. *In re West Electronics, Inc.*, 852 F.2d at 83; *In re Trans World Airlines, Inc.*, 261 B.R. 103, 115 (Bankr.D.Del.2001). However, the rights of a trustee expressly include the rights the debtor has under executory contracts and the debtor in possession is vested with all the rights and powers of a trustee. 11 U.S.C. §§ 365, 541, 1107; *In re Access Beyond Tech., Inc.*, 237 B.R. at 39. Licenses are generally considered to be executory contracts and thus the rights of the debtor under such licenses are vested in the debtor in possession as of the petition date. *See In re Golden Books,* 269 B.R. at 308; *In re Access Beyond Tech., Inc.*, 237 B.R. at 43. A finding that the debtor in possession may exercise rights under contracts during the pendency of the case even though the contracts are not assumable under 11 U.S.C. § 365(c) does not conflict with federal copyright law which prohibits the assignment of non-exclusive licenses since the debtor is not assigning the license to the debtor in possession.

■ The case cited by the Objecting Vendors for the proposition that the debtor in possession may not exercise the license rights possessed by the debtor at the commencement of the case is inapplicable here because there is no similar fidu-

---

69. Except that The Music Cartel, Inc., Beatville Records, and Rotten Records, Inc. have made credible, factual assertions that their Distribution Agreements may have been terminated pre-petition in accordance with the requirements of paragraph 12 or 13.1 of those agreements. I will discuss my findings regarding the Distribution Agreements of these

three Objecting Vendors in section 5 of this opinion, *infra.*

70. The relief from stay motions were to recover the Contested Inventory. Generally the relief motions asserted that the Contested Inventory was not property of the estate because it was on consignment and the Objecting Vendors held title to the inventory.

ciary duty between the pre-petition debtor and the Objecting Vendors that would conflict with the duties of the Debtor in Possession to the estate creditors. *See In re Harms*, 10 B.R. 817, 821–22 (Bankr. D.Colo.1981) (decided within the context of the fiduciary duties of a general partner to limited liability partners and the unique aspects of partnership agreements and partnership law.) *citing Matter of Unishops, Inc.*, 543 F.2d 1017 (2d Cir.1976) [71]. Additionally, although *In re West Electronics, Inc.* recognizes that the pre-petition debtor and the debtor in possession are different entities, the debtor in possession is not a "third party" for whom the debtor would have to get a licensor's permission prior to assignment. *See* 852 F.2d at 83 ("Thus, if non-bankruptcy law provides that the government would have to consent to an assignment of the West contract to a third party, i.e., someone 'other than the debtor or the debtor in possession' then West, as the debtor in possession cannot assume that contract.") As indicated in 11 U.S.C. § 365(c), the debtor in possession becomes the party to the executory contract, without assignment as of the petition date:

"(c) the trustee [which includes the debtor in possession] may not assume ...any executory contract...if ...(1)(A) applicable law excuses a party, other than the debtor, to such contract...from accepting performance from...**an entity other than the debtor or debtor in possession**...and (B) such party does not consent to such assumption...." (emphasis added)

*See In re West Electronics, Inc.*, 852 F.2d at 82–83; 11 U.S.C. § 365(c)(1)(A) & (B), (changes in *In re West Electronics, Inc.*). The language of this section indicates that the non-debtor party to the contract is required to accept performance from the debtor in possession despite the executory nature of the contract and the possibility that it may not be assumable by that debtor in possession. The remedy of the non-debtor party is a motion to lift the automatic stay in order to terminate the non-assumable contract. *See In re West Electronics, Inc.*, 852 F.2d at 80, 82 (court ruled that the bankruptcy and district courts should have granted the non-debtor's motion to lift stay and terminate executory contract according to its terms when the debtor in possession could not assume the contract under 11 U.S.C. § 365(c)(1)).

Thus, I conclude that the Debtor in Possession in this case is not required to assume the licenses to make use of the rights they contain. The cases cited by the Objecting Vendors to support their arguments that the Debtor in Possession

---

**71.** While *Harms* held a that the debtor and the DIP were separate entities, the court based it's decision that a debtor in possession could not remain the general partner in a partnership on the personal nature of the agreement and the inherent conflicts of interests in the fiduciary duty a general partner owes to its limited partners and the fiduciary duty a debtor in possession owes to creditors of the general partner's estate. Thus the court found that the partnership dissolved at the petition date when the general partner ceased to exist.

*Unishops* cited to the proposition that debtor and debtor in possession are not the same entity only to reassert that use of that proposi-

tion was limited to the rejection of labor collective bargaining agreements by a debtor in possession without following the requirement of § 8(a) of the National Labor Relations Act. *See Unishops*, 543 F.2d at 1018. The *Shopmen's* court, which established the rule, had held that the debtor in possession was not a party to the labor agreement and was not bound by the restriction on termination contained in the statute. *See Shopmen's Local Union No. 455 v. Kevin Steel Products, Inc.*, 519 F.2d 698, 704 (2d Cir.1975); *Truck Driver's Union No. 807 v. The Bohack Corp.*, 541 F.2d 312, 319–20 (2d Cir.1976) (limiting the holding of *Shopmen's*.)

may not assume the licenses pursuant to the restrictions of § 365(c)(1) [72] or assign [73] the licenses under the law of copyright are not relevant to these facts. The Debtor in Possession is not seeking to either assume the licenses for the benefit of the post bankruptcy reorganized company or to assume and assign (i.e., sell) the licenses for the benefit of the estate.

Indeed, the Debtor in Possession is not seeking to exercise any right that it did not already possess as of the commencement of the case and is not seeking to obtain additional performance from the Objecting Vendors. The exercise of the right to sell will not place any obligation on the Objecting Vendors that did not already exist as of the delivery of the Contested Inventory to Valley. As of the time that Valley signed the Distribution Agreements, it had the right to distribute the product of the Objecting Vendors by a method in its sole discretion (DA ¶ 5.1(a)), at a price within Valley's sole discretion (DA ¶ 4.1), without needing to request further permission from the Objecting Vendors, obtain third party permissions for sale, or pay royalties to the Music Authors or Artists. (DA ¶¶ 2, 7.1(c), 9.2.) The Objecting Vendors, through the Distribution Agreements, guaranteed that any product delivered for sale would have clear and marketable title and the sale of the product would not violate any copyright or trademark. (DA ¶¶ 7.1(a)-(e), 9.1.) The parties offered cross indemnification for damages resulting from breaches of the agreements. (DA ¶¶ 10.1, 10.2.) As part of the guarantee of good title, the Objecting Vendors indemnified Valley against intellectual property claims by other copyright holders (such as the Music Writers and the Artists) resulting from Valley's use of the Materials or sale of the Product. (DA ¶ 9.3.) Additionally, the Objecting Vendors retained the responsibility for making all royalty payments, including mechanical royalties. (DA ¶ 5.3(a).) Thus at the time the Contested Inventory was delivered, Valley had authorized possession of the product, authority to sell free of infringement claims by third parties or the Objecting Vendors, and a promise from the Objecting Vendors to indemnify Valley on any infringement claims from third parties. All of these rights became property of the estate as of the petition date and may be exercised by the Debtor in Possession without the need to assume the Distribution Agreements.

Therefore, I find that Valley, as the Debtor in Possession has the requisite authority to sell the Contested Inventory rather than mere authorized possession [74]. The Auction Sale will qualify as a "first sale" where the owner of the copyrights or exclusive licensee of those Copyright Owners authorized another to sell the copies or phonorecords embodying the copyrighted work.

*The Auction Sale Does not Exceed the Scope of the License:*

 A licensee may not exceed the scope of the permission granted in a license. *See MacLean Assoc., Inc. v. Mer-*

---

72. For the proposition that the licenses are not assumable by the debtor in possession, the Objecting Vendors cite to: *In re Access Beyond Technologies,* 237 B.R. 32, 48 (Bankr. D.Del.1999); *In re Golden Books,* 269 B.R. 300 (Bankr.D.Del.2001); *In re CFLC, Inc.,* 89 F.3d 673 (9th Cir.1996).

73. For the proposition that the licenses are not assignable without the licensor's consent, the Objecting Vendors cite to: *Gardner v. Nike,* 30 Fed.Appx. 726 (9th Cir.2002)

74. *See e.g.,Quality King,* 523 U.S. at 146–47, 118 S.Ct. at 1130; *Platt & Munk, Co.,* 315 F.2d at 851–52 (lawful possession by another does not deprive copyright proprietor of right to control transfer of the copyrighted objects).

cer–Meidinger–Hansen, Inc., 952 F.2d 769, 779 (3d Cir.1991) (the licensor may still bring an infringement suit if the licensee's use of the implied license exceeds its scope); S.O.S. Inc. v. Payday, Inc., 886 F.2d 1081, 1087 (9th Cir.1989) (licensee infringes owner's copyright if it exceeds scope of license). Thus any sale by the Debtor is confined to the scope of the permission granted by the Objecting Vendors in the licenses to distribute contained in the Distribution Agreements. The contract law of the state governing the Distribution Agreements provides the rules of contractual construction of licenses to the extent that they do not interfere with the federal protection of intellectual property. See S.O.S. Inc. v. Payday, Inc., 886 F.2d at 1087; Intel Corp. v. Broadcom Corp., 173 F.Supp.2d 201, 210 (D.Del.2001) (a license agreement is a contract governed by state law) [75]. I find the Distribution Agreements unambiguous on this issue. The Debtor is authorized under the Distribution Agreements to "use commercially reasonable efforts to distribute the Label's Product by soliciting and fulfilling orders for such Product. The method of distribution of Products hereunder and the collection of payment therefor shall be within the sole discretion of Distributor." (DA ¶ 5.1(a).) [76] The Distribution Agreements also granted Valley sole discretion to set the sale price for the consigned inventory. (DA ¶ 4.1.) Valley was appointed the Objecting Vendors "sole and exclusive distributor for the Products during the Term within the United States, its territories and possessions (the 'Territories') . . ." (DA ¶ 2.) I find no other restrictions on the authority to distribute. Therefore as long as the auction sale is to purchasers within the United States, the scope of the authority to sell will not be violated.

### 3. NO ADMINISTRATIVE PRIORITY CLAIM FOR SALE OF CONTESTED INVENTORY

■ The Objecting Vendors have asserted that the post-petition sale of the Contested Inventory will give rise to an administrative claim under 11 U.S.C. § 363(b). (Obj. to Debtor's FOF, Doc. 573 at 15) I find that the Auction Sale will not give rise to any administrative claim.

■ To establish administrative expense priority the burden is on the claimant to demonstrate that the obligation claimed as an administrative expenses (1) arose out a post-petition transaction with the debtor in possession and (2) directly and substantially benefitted the estate.

---

**75.** California law on the construction of contracts requires that I "give effect to the mutual intent of the parties as it existed at the time of the contracting, so far as it is ascertainable and lawful. Cal. Civ Code § 1636; AIU Ins. Co. v. Superior Ct., 51 Cal.3d 807, 274 Cal. Rptr. 820, 799 P.2d 1253, 1264 (1990). . . 'Such intent is to be inferred, if possible, solely from the written provisions of the contract.' AIU Ins., 274 Cal.Rptr. 820, 799 P.2d at 1264 (citing Cal. Civ.Code § 1639). In construing a contract, 'no term shall be considered uncertain or ambiguous if its meaning can be ascertained by fair inference from the terms of the agreement.' Ellis v. McKinnon Broadcasting Co., 18 Cal.App.4th 1796, 23 Cal.Rptr.2d 80 (1993). Thus '[i]f contractual language is clear and explicit, it governs'.

Foster–Gardner, Inc. v. National Union Fire Ins. Co., 18 Cal.4th 857, 77 Cal.Rptr.2d 107, 959 P.2d 265, 272 (1998)." Intel Corp. v. Broadcom Corp., 173 F.Supp.2d 201, 210–11 (D.Del.2001). (case interpreting patent licenses under California law) The determination of ambiguity is the court's to make. Id.

**76.** The Objecting Vendors cite to the D3 Distribution Agreement (D3 Ex.# 1 at ¶ 5.1(b)) under which Valley is to use "reasonable efforts to promote the sale of the Label's Product through Distributor's wholesale and retail customers." (Obj. Vendor's FOF, Doc. 521 at 16.) However, ¶ 5.1(b) of that agreement deals with promotions and advertising, not method of sale.

*Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.),* 181 F.3d 527, 532–33 (3d Cir.1999); *In re Mid–American Waste,* 228 B.R. at 821; *Microsoft Corp. v. DAK Indus., Inc. (In re DAK Indus., Inc.),* 66 F.3d 1091, 1094 (9th Cir.1995). The principal purpose of 11 U.S.C. § 503 is to induce entities to do business with a debtor after bankruptcy by insuring that those entities receive payment for services rendered. *In re DAK Indus., Inc.,* 66 F.3d at 1097. Section 503(b) contemplates some quid-pro-quo wherein the estate accrues debt in exchange for some consideration necessary to the operation of the estate. *Pennsylvania Dept. of Environmental Resources v. Tri–State Clinical Laboratories, Inc.,* 178 F.3d 685, 689–90 (3d Cir.1999). Priority is granted to compensate the providers of necessary goods, services or labor. *Id.* A debt is not entitled to administrative priority merely because the right to payment arises post-petition. *In re Mid–American Waste Systems,* 228 B.R. at 821. It is the substantial contribution to the estate, not the activity, such as sale, that incurs the obligation that must occur in the chapter 11 case. *Lebron v. Mechem Fin., Inc.,* 27 F.3d 937, 944 (3d Cir.1994).

As discussed in section 1 of this opinion, *supra,* the Objecting Vendors will have an unsecured claim against the Debtor's estate for the invoice value of the Contested Inventory pursuant to the operation of 11 U.S.C. § 544(a) in connection with the Objecting Vendors' failure to prove an exception under former U.C.C. § 2–326(3) or revised U.C.C. § 9–102(a)(20). It is clear that under Third Circuit law, the sale of this inventory would not create an administrative expense claim. The inventory was provided to Valley pre-petition and does not represent a post-petition transaction with the Debtor in Possession.

The remaining question is whether the post-petition sale of the Contested Inventory is a use of an executory license that would give rise to an administrative claim. *See N.L.R.B. v. Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984). (during the post-petition period in which the debtor has yet to assume or reject an executory contract, the debtor is obligated to pay for the reasonable value of services provided under that contract). While it is true that the Debtor will make use of the permissions granted by the Distribution Agreements in order to sell the Contested Inventory, a post-petition act does not alone create a administrative expense. *In re Mid–American Waste Systems,* 228 B.R. at 821. There must also be a contribution of value to the estate from a post-petition transaction with the debtor.

Here the alleged contribution to the estate is the permission to sell. This permission was granted pre-petition along with the delivery of the Contested Inventory. That permission survived the commencement of the chapter 11 case and became a property right of the estate. There is no post-petition transaction with the Debtor in this case. There is no post-petition service being provided by the Objecting Vendors. And finally, there is no additional value that accrues to the estate under the license other than what already existed as of the commencement of the case. At the time the Contested Inventory was delivered, Valley had authorized possession of the product, authority to sell free of infringement claims by third parties of the Objecting Vendors, and a promise from the Objecting Vendors to indemnify Valley on any infringement claims from third parties. The Objecting Vendors will not be providing any additional value on the sale of the inventory. *See In re DAK Indus., Inc.,* 66 F.3d at 1097 (no administrative expense where the licensor was not induced to do business with the debtor post-

petition and did not do business with the debtor post-petition). The debtor in possession has not sought any additional performance under the Distribution Agreements and the Objecting Vendors have not delivered additional inventory that would give rise to obligations that did not exist as of the petition date.

## 4. EQUITABLE RELIEF FROM AUCTION SALE NOT WARRANTED

██ The Objecting Vendors have also raised the issue that the proposed Auction Sale will impose an inequitable burden on them since the Contested Inventory may be returned to the Objecting Vendors for the price they would have invoiced to Valley, regardless of the price paid at auction.[77] In support, the Objecting Vendors assert that it is inequitable that they be exposed to the risk of paying for returns when they have expended manufacturing costs, will receive no money from the sale of the Contested Inventory, and will also be liable for royalties and fees to third parties due on the sale of the Contested Inventory. The Objecting Vendors were aware of the commercial realities of their industry's return policy and I see no reason to relieve them of a burden common to all members of that industry. Nor do I see any reason to relieve the Objecting Vendors of their contractual obligations to make payments to third parties, such as the Music Writers or the Artists, which the Objecting Vendors assumed under the terms of the Distribution Agreements. (DA at ¶¶ 5.3(a),7.1(c).)

The Court previously addressed a motion based on the "inequity" of the industry return policy at the February 6, 2002 hearing when I denied Columbia Tri–Star's request that the Court require the Debtor to mark Columbia Tri–Star's product prior to selling it under the Auction Order. (Tr. 2/06/02 The Court, 77:21–78:9.) Columbia Tri–Star requested the marking so that it could avoid the effects of the industry return policy for product sold under the Auction Sale. The same concerns expressed at the February 6, 2002 hearing are present in the matter before me and I see no reason to revise or alter my ruling on the issue merely because the Objecting Vendors were consignment vendors and Columbia Tri–Star was a terms vendor. Therefore, I will deny any request that the Contested Inventory be excluded from the Auction Sale or marked for such sale based on the return policy or any other burdensome contractual obligation which the Objecting Vendors assumed under the Distribution Agreements.

## 5. NON–APPLICABILITY OF THIS DECISION TO CERTAIN OBJECTING VENDORS.

Three of the Objecting Vendors have asserted that their Distribution Agreements were terminated prepetition according to the terms provided in ¶ 13.1 or ¶ 12 of those agreements. This section of the opinion applies only to these three Objecting Vendors who put forth some concrete factual allegations that conformed to these two termination provisions in the Distribution Agreements:

1. *The Music Cartel, Inc.*: Based on the testimony and documents submitted into evidence by Eric Lemasters of The Music Cartel, Inc. ("MCI"), I find that

---

**77.** For example, if an Objecting Vendor invoiced DNA $8.00 for a title, the record industry return policy would allow a retailer or any entity that purchased the goods at auction to return that item to the Objecting Vendor for the full $8.00, regardless of how much they paid at auction. (Tr. 2/26/02 Himelfarb, 21:6–22:10); *See* CIL Ex. 1 at Ex. A (listing prices to be paid by distributor); CIL Ex. 2 at Ex. A (same).

MCI successfully terminated its Distribution Agreement (CIL Ex. 7) prepetition pursuant to paragraph 13.1 of that agreement. The cure period in that agreement was only 15 days and the notice letters sent to DNA/Valley indicate that MCI properly and effectively exercised its termination rights under the agreement and had requested the return of its inventory. (CIL Ex. 7 at ¶ 13.1); (CIL Ex. 10, 11); (Tr. 2/26/02 Lemasters 37:9–39:11). Therefore, the Debtor has no rights in the inventory nor authority to sell it. MCI's request for relief from the stay to recover the inventory is granted.

2. *Beatville Records*: Based on the testimony and documents submitted into evidence by Marc Dickinson of Beatville Records ("Beatville"), I find that DNA terminated Beatville's Distribution Agreement (CIL Ex. 3) prepetition pursuant to paragraph 12 of that agreement. Marc Dickinson testified that his agreement with DNA was terminated by DNA in writing prepetition. (Tr. 2/27/02 Dickinson, 6:9–8:20) DNA sent Beatville Records an e-mail dated August 02, 2001 (CIL Ex. 12) confirming that an e-mail was sent on July 31, 2001 in accordance with paragraph 12 of the agreement and re-stating their intent not to renew the Beatville's Distribution Agreement unless Dickinson consented to moving Beatville to Emerge (another division of Valley). (CIL Ex. 3 at ¶ 12.) Debtor did not challenge the authenticity of this document. Paragraph 12 provides the Term of the Agreement as well as means for non-renewal. *Id.* Paragraph 12 of the agreement states that the initial terms was to expire October 31, 2000 and would automatically renew for one year unless written notice to terminate was given 90 days before the termination date. The e-mail was sent pursuant to this clause to express DNA's intent not to renew if the condition of moving Beatville to Emerge was not met. No breach was required to terminate under this clause. (CIL Ex.3 at ¶ 12) Paragraph 14.7 requires written notice be sent by "express mail, registered, or certified mail, or telefax with a hard copy to follow via airmail." (CIL Ex.3) However, it was Valley/DNA that sent the termination notice via e-mail and confirmed the same. While product was shipped during the 90 notice period, none was shipped after 10/31/01 which was the expiration date of the agreement. (Tr. 2/27/02 Dickinson 9:23–10:22) Debtor provided no evidence of Dickinson's consent to be moved to Emerge, any other negotiated renewal of the agreement, or that any product was shipped after October 31, 2001. Therefore, the Debtor has no rights in the inventory nor authority to sell it. Beatville's motion for relief from the stay to recover its inventory is granted.

3. *Rotten Records, Inc.*: In their objection to the Auction Sale (Doc. 123) Rotten Records, Inc. ("Rotten") states that their Distribution Agreement with DNA expired on July 31, 2000 and that the 240 day return period expired in April 2001. (Doc. 123 at Ex. B.) Rotten's Distribution Agreement did not contain a renewal clause in paragraph 12 and simply stated that it expired on July 31, 2000. (CIL. Ex.1 at ¶ 12.) On November 20, 2001, Rotten sent a demand letter for the return of its inventory. (Doc 123 at ¶ 5 and Ex. B.) No other letters regarding termination or intent not to renew were submitted to the Court by either party. No evidence was presented as to whether or not Rotten continued to ship inventory to DNA/Valley after July 31, 2000.

The apparent expiration of the Distribution Agreement is not controlling in this case. A non-exclusive license may be inferred from a course of dealing between the copyright holder and another party. *See De Forest Radio Tel. Co. v.*

*United States,* 273 U.S. 236, 241, 47 S.Ct. 366, 367, 71 L.Ed. 625 (1927); *MacLean Assoc., Inc.,* 952 F.2d at 778–79; *Foad Consulting Group, Inc. v. Musil Govan Azzalino,* 270 F.3d 821, 826 (9th Cir.2001); *McCoy v. Mitsuboshi Cutlery, Inc.,* 67 F.3d 917, 920 (Fed.Cir.1995); 3 *Nimmer on Copyright* § 10.03[A][7] at 10–42 (2001) ("...[A] nonexclusive license may therefore be granted orally, or may even be implied from conduct. When the totality of the parties' conduct indicates an intent to grant such permission, the result is a non-exclusive license.") A non-exclusive license is not a transfer of ownership of the copyright itself within the provision of the Copyright Act and thus need not be in writing. *See MacLean Assoc., Inc.,* 952 F.2d at 778–79. Here, the implied license would be for authority to sell and as such is merely the authority to use of one of the five property rights held by a copyright owner, not a transfer of the property right itself. *Rodrigue v. Rodrigue,* 218 F.3d 432, 435 (5th Cir.2000) (a copyright is a finite bundle of five fundamental rights which includes exclusive rights to reproduction, adaptation, publication, performance, and display). The licensor may still bring an infringement suit if the licensee's use of the implied license exceeds its scope. *MacLean Assoc., Inc.,* 952 F.2d at 779. While federal copyright law may recognize an implied license from a course of dealings, whether such a license arises and the scope of such a license is determined by state contract law, here the law of the state of California. *McCoy,* 67 F.3d at 920 (an implied license is governed by state contract law) No evidence has been presented by either party as to the course of dealings between Valley and Rotten after July 31, 2000.

Therefore, based on the record, the Court is not in a position to determine whether Rotten is entitled to the same relief as Beatville and MCI. The Court will hold in abeyance any determination regarding Rotten's rights to the inventory it supplied to DNA pending further submissions by the parties. Such submissions should address evidence of the dealings between DNA/Valley and Rotten after July 31, 2000, as well as relevant California contract law.

## CONCLUSION:

For the reasons set forth above, the motion of the Debtor to sell the Contested Inventory consigned by the Objecting Vendors (Doc. 118) is granted with regard to the inventory provided by the Objecting Vendors other than MCI, Beatville, and Rotten. The Certain Independent Labels' Relief Motion (Doc. 503) pertaining to the Contested Inventory is granted only as to MCI and Beatville and is denied as to the other Objecting Vendors' joined in that motion. The Objecting Vendors' Relief Motions (Doc. 50, 77, 126, 127, 181 and 284) pertaining to the Contested Inventory are denied. The Court will continue to take under advisement the rights of Rotten (Doc. 123) for the reasons discussed above and invites the parties to make further submissions on the matter.

## ORDER

For the reasons set forth in the Court's Opinion of this date:

1. The motion (Doc. 118) of the Debtor, Valley Media Inc., to sell the inventory consigned by certain objecting vendors is **GRANTED** with regard to inventory supplied by the objecting vendors other than The Music Cartel, Inc., Beatville Records and Rotten Records, Inc. The motion (Doc. 118) is **DENIED** with regard to the inventory supplied by The Music Cartel, Inc. and Beatville Records and as to Rotten Records, Inc., a ruling is held in abeyance regarding the inventory supplied by Rot-

ten Records, Inc. pending further submissions by the parties.

2. The Certain Independent Labels' motion for relief from the stay (Doc. 503) is **GRANTED** as to The Music Cartel, Inc. and Beatville Records and **DENIED** with regard to the other objecting vendors included in that motion.

3. A ruling on the motion for relief from the stay filed by Rotten Records, Inc. (Doc. 123) is held in abeyance pending further submissions by the parties.

4. The objecting vendors' remaining motions for relief from the stay (Docs. 50, 77, 126, 127, 181, and 284) pertaining to the inventory are **DENIED.**