**ORDERED PUBLISHED**

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | BAP No.   WW-16-1424-KuFB |
| PETTIT OIL COMPANY, | Bk. No.   3:13-bk-47285-PBS |
| Debtor. | Adv. No.   3:14-ap-04222-PBS |
| IPC (USA), INC., | |
| Appellant, | |
| v. | **O P I N I O N** |
| KATHRYN A. ELLIS, Chapter 7 Trustee, | |
| Appellee. | |

Argued and Submitted on September 28, 2017
at Seattle, Washington

Filed - October 23, 2017

Appeal from the United States Bankruptcy Court
for the Western District of Washington

Honorable Paul B. Snyder, Bankruptcy Judge, Presiding

_____

Appearances:     Edwin K. Sato of Bucknell Stehlik Sato & Orth, LLP, argued for appellant, IPC (USA), Inc.; Andrew H. Morton of Foster Pepper PLLC argued for appellee, Kathryn A. Ellis, Chapter 7 Trustee.

_____

Before:   KURTZ, FARIS, and BRAND, Bankruptcy Judges.

KURTZ, Bankruptcy Judge:

Kathryn A. Ellis, chapter 7[1] trustee (Trustee), filed an adversary complaint against appellant, IPC (USA), Inc. (IPC), seeking to avoid under § 544(a)(1), IPC's unperfected security interest in consigned fuel inventory, accounts receivable (A/R), and cash (Cash) all of which were in the possession of the debtor, Pettit Oil Company (Debtor), on the petition date.

The bankruptcy court granted partial summary judgment in favor of Trustee, ruling that the agreement between IPC and Debtor was a "true" consignment under Revised Article 9 (Article 9) of the Uniform Commercial Code (U.C.C.) § 9-102(a)(20). Under U.C.C. § 9-319(a), for purposes of determining the rights of Debtor's creditors while the fuel inventory was in its possession, Debtor is deemed to hold rights and title to the goods identical to those the consignor, IPC, had or had power to transfer. In contrast, under U.C.C. § 9-103(d), IPC is deemed to hold only a purchase-money security interest in the consigned goods as against creditors of Debtor-consignee. It is undisputed that IPC did not perfect its interest in the consigned fuel. Applying these statutes, the bankruptcy court found that IPC's interest in the fuel inventory was subordinate to the rights of Trustee as a judicial lien creditor.

Subsequently, the court granted partial summary judgment in

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

-2-

favor of Trustee, ruling that IPC's interests in the A/R and Cash generated from the sale of the consigned fuel and held by Debtor on the petition date was also subordinate to the rights of Trustee because IPC had not complied with the U.C.C.'s perfection rules for priority in accounts receivable or cash.

In a final ruling, the bankruptcy court granted summary judgment in favor of Trustee awarding damages in the amount of $5,493,498.69 on her claims against IPC, consisting of: $1,161,754.00 for the fuel inventory, $3,895,961.69 for the A/R, and $435,783.00 Cash that was in Debtor's bank account on the petition date.

IPC argues on appeal that the bankruptcy court erred by including the value of the A/R and Cash in the judgment. IPC contends that under U.C.C. § 9-319, Trustee could reach only the "goods" - the fuel inventory - in the possession of Debtor on the petition date because the U.C.C. definition of "goods" does not include A/R and Cash. In short, U.C.C. § 9-319 should not be applied beyond its scope. Relying on the underlying consignment agreement between the parties, IPC contends that it is the only party with an interest in the A/R and Cash.

For the reasons explained below, we find no support for IPC's proposition in Article 9 or elsewhere. Accordingly, we AFFIRM.

## I. FACTS

### A. The Consignment Agreement Between IPC and Debtor

Debtor was a distributor of bulk oil, gas, diesel and lubricant products and sold fuel products at self-fueling sites

-3-

known as "cardlock sites."[2]

On September 1, 2013, IPC entered into a Consignment and Service Agreement (CSA) with Debtor. Under the CSA, IPC provided fuel to various cardlock sites owned or leased by Debtor. IPC retained title to the fuel until the fuel was sold to end user customers. Debtor was obligated to maintain the financial records for the consignment transactions, including booking and accounting for receivables and administering, invoicing, collecting, and remitting payments to IPC for the full cost of all consigned fuel sold by Debtor. In consideration, IPC agreed to pay Debtor a monthly commission.

Debtor was also required to instruct its customers to make payments directly to IPC's lockbox account at Union Bank in San Francisco. However, upon implementation of the CSA, many cardlock customers continued to send payments for IPC fuel purchased at Debtor's cardlock sites to Debtor's account, a lockbox with Debtor's lender, KeyBank National Association (KeyBank). The CSA provided that if Debtor's customers sent payments to Debtor instead of IPC, Debtor was to promptly forward those payments to IPC. California law governed the interpretation of the CSA.

It is undisputed that IPC never filed a financing statement or otherwise perfected its interests in the consigned fuel, the A/R, or Cash.

///

---

[2] Many of the facts are set forth in the bankruptcy court's memorandum decision, Ellis v. IPC (USA), Inc. (In re Pettit Oil Co.), 2016 WL 3049607 (Bankr. W.D. Wash. May 19, 2015).

-4-

**B.    Bankruptcy Events**

Debtor filed a chapter 11 petition in November 2013 (Petition Date).  At the time of filing, there was an unquantified amount of IPC fuel remaining in the tanks at Debtor's cardlock sites.  In addition, there were unpaid accounts receivable for IPC fuel that had been sold and invoiced to Debtor's customers, accounts receivable outstanding for sales of IPC fuel that had been sold but not yet invoiced to Debtor's customers, and cash in Debtor's KeyBank lockbox for sold and invoiced IPC fuel that customers had mistakenly sent to Debtor instead of to IPC's lockbox.  Debtor ceased operations, and its case converted to chapter 7 in January 2014.  Ellis was appointed the chapter 7 trustee.

Trustee filed an adversary proceeding against IPC,[3] alleging five causes of action, two of which are relevant here. In her first cause of action, Trustee sought a declaration that the CSA was a "true" consignment as defined in U.C.C. § 9-102(a)(20) and that, as of the Petition Date, IPC held no more than an unperfected security interest in the consigned fuel inventory, A/R, and Cash which was in Debtor's possession on the Petition Date.  In her second cause of action, Trustee alleged that as a hypothetical judgment lien creditor under § 544(a)(1), she could avoid IPC's unperfected security interest and recover

---

[3] Trustee also named KeyBank and Pettit Properties, Inc. (PPI) as defendants.  KeyBank answered the complaint and filed a cross-claim against IPC and PPI.  IPC answered the complaint and filed a counterclaim against Trustee and cross-claims against KeyBank and PPI.  These cross-claims were resolved in separate proceedings.

from IPC the value of the consigned fuel inventory, A/R, and Cash under § 550 for the benefit of the estate. Trustee later amended her second cause of action to allege that she had avoidance powers under § 549 with respect to postpetition payments made by Debtor to IPC relating to fuel sales.

Trustee moved for partial summary judgment on her first and second causes of action. After a hearing, the bankruptcy court issued a memorandum decision and entered an order granting partial summary judgment to Trustee. The court noted that IPC had conceded that all the elements under U.C.C. § 9-102(a)(20) for showing a "true" consignment were met, and found that the elements were indeed met. The bankruptcy court thus concluded that Article 9 governed Trustee's rights as a judicial lien creditor. U.C.C. § 9-109(a)(4).

Article 9 treats a consignor such as IPC the same as a secured party holding a purchase-money security interest (PMSI) in the consigned goods. U.C.C. § 9-103(d). Since IPC did not perfect its security interest in the consigned fuel, the bankruptcy court granted Trustee summary judgment on her first cause of action, declaring that the CSA was a "true" consignment subject to the provisions of U.C.C. § 9-319(a).

As to Trustee's second cause of action, IPC contested that Trustee could acquire a judicial lien on the A/R and Cash which were generated from the prepetition sales of the consigned fuel and in Debtor's possession on the Petition Date. IPC argued that it was entitled to the Cash because the CSA required payments to be sent directly to IPC. IPC further asserted that Debtor held the A/R and Cash in a constructive trust for IPC and

thus they were not subject to attachment by Trustee under § 544(a)(1).

The bankruptcy court ruled that a constructive trust would not be imposed, and IPC does not contest that ruling in this appeal. The court granted Trustee's motion, in part, finding that, under § 544(a)(1), Trustee had a senior security interest in the fuel inventory in existence on the Petition Date and also in any proceeds arising from further sales of those goods. U.C.C. §§ 9-315(a)(2); 9-319(a). The court denied Trustee's summary judgment motion without prejudice on the issue whether Trustee held a superior interest in the A/R and Cash held by Debtor on the Petition Date because the parties had not briefed choice-of-law issues which were relevant to the outcome.

At a subsequent hearing, the bankruptcy court noted that California law governed the interpretation of the CSA and Washington (location of Debtor) and Ohio law (location of KeyBank) governed the perfection and priority rights at issue. The court observed that California, Washington, and Ohio had adopted essentially identical versions of the relevant U.C.C. provisions. Therefore, to simplify matters, the court made reference to the U.C.C. rather than citing to the applicable state statutes.[4] The bankruptcy court read its oral ruling into the record and entered an order finding that Trustee as a hypothetical judgment lien creditor had a senior interest to IPC in the A/R and Cash which were in the possession of Debtor on the Petition Date.

_____

[4] We do so as well.

-7-

The court later heard argument on the amount of the damages that Trustee should be awarded for the value of the consigned fuel inventory, A/R, and Cash, and took the matter under advisement. The bankruptcy court issued a memorandum decision awarding Trustee damages in the sum of $5,493,498.69 and entered a final judgment in favor of Trustee for that amount.[5] IPC timely appealed.

## II.  JURISDICTION

The bankruptcy court had jurisdiction over this proceeding under 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (E).  We have jurisdiction under 28 U.S.C. § 158.

## III.  ISSUE

Did the bankruptcy court err when it granted partial summary judgment in favor of Trustee by finding that, as a matter of law, under § 544 and Article 9, Trustee had a superior interest to IPC as of the Petition Date in the A/R and Cash?

## IV.  STANDARD OF REVIEW

The bankruptcy court granted summary judgment on a legal question of statutory interpretation under the U.C.C., and the essential facts are undisputed.  We therefore review its decision de novo.  <u>Wyle v. Pac. Mar. Ass'n (In re Pac. Far East Line, Inc.)</u>, 713 F.2d 476, 478 (9th Cir. 1983).

## V.  DISCUSSION

Section 544 provides in relevant part:

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the

---

[5] Final judgments were also entered relating to the cross-claims of KeyBank and IPC.

-8-

> trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—
>
>> (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists[.]

"Under [§] 544(a), unperfected security interests are avoidable and can be relegated to the status of general unsecured claims." Neilson v. Chang (In re First T.D. & Inv., Inc.), 253 F.3d 520, 525 (9th Cir. 2001); U.C.C. § 9-322(a)(2) ("A perfected security interest . . . has priority over a conflicting unperfected security interest . . . ."). The bankruptcy court ruled that the CSA was a "true" consignment under U.C.C. § 9-102(a)(20) and therefore properly analyzed Trustee's rights as a judicial lien creditor under Article 9.

U.C.C § 9-319(a) applies when a creditor of the consignee seeks to recover against the consigned goods. In re Valley Media, Inc., 279 B.R. 105, 123 n.30 (Bankr. D. Del. 2002). The statute provides that, "for purposes of determining the rights of creditors of . . . a consignee, while the goods are in the possession of the consignee, the consignee is deemed to have rights and title to the goods identical to those the consignor had." A consignor such as IPC is treated as a secured party holding a PMSI in the consigned goods. U.C.C. § 9-103(d).

U.C.C. §§ 9-319(a) and 9-103(d) work in tandem to determine the rights of a debtor's creditors while consigned goods are in a debtor's possession. That is, a debtor is deemed to hold

-9-

rights and title to the goods such that its creditors can attach the consigned goods as if the debtor actually had title and obtain priority over a consignor who fails to perfect its PMSI in the goods. The purpose behind U.C.C. § 9-319(a) is to protect general creditors of the consignee from claims of consignors that have undisclosed consignment arrangements with the consignee that create secret liens on the inventory. In re Valley Media, Inc., 279 B.R. at 125.

By its plain language, U.C.C. § 9-319(a) applies to the consigned "goods." The statute does not determine priority in cash or accounts receivable generated by the sale of the consigned fuel. Once the fuel inventory was sold, title transferred to the buyer and the secret lien in the inventory is no longer a concern to third party creditors. After the fuel was sold to third parties, Debtor was obligated to pay IPC. Indeed, the CSA provides that Debtor was to promptly forward payments which were mistakenly made to it. Moreover, Debtor was responsible for invoicing and collecting the amounts due for fuel that it sold. Under this arrangement, IPC was a general unsecured creditor for amounts due.

IPC cannot simply rely on the CSA to obtain priority over a judicial lien holder in the A/R and Cash. Again, this presents the problem of a secret lien vis-a-vis a debtor's creditors. As mentioned by the bankruptcy court, when a creditor makes a decision to lend funds to a consignee, its decision is necessarily based on all the property in the consignee's possession. If IPC intended to claim priority over a judicial lien creditor or another secured creditor in the A/R and Cash,

it was required to perfect its security interests therein according to the rules set forth in Article 9.

For all purposes that matter to this case, the U.C.C. treats a "true" consignment (such as IPC's) as a secured transaction. The definitions of Article 9's key terms make this clear: "security interest" includes "any interest of a consignor," U.C.C. § 1-201(b)(35); "collateral" means "the property subject to a security interest" and includes "goods that are the subject of a consignment," U.C.C. § 9-102(a)(12)(C); "secured party" means (among others) a "consignor," U.C.C. § 9-102(a)(73)(C); and "debtor" means (among others) a "consignee," U.C.C. § 9-102(a)(28)(C). Section 9-103(d) eliminates any possible doubt: "The security interest of a consignor in goods that are the subject of a consignment is a purchase-money security interest in inventory."

IPC's basic argument is that consignments are treated like purchase-money security interests only for certain limited purposes. This is exactly backwards. The rights of a "true" consignor are the same as the rights of a secured party, unless a U.C.C. section provides otherwise.

If IPC and Debtor had signed a security agreement rather than a consignment agreement, this would be an easy case. If IPC had filed a financing statement, its security interest in the fuel would be perfected under U.C.C. § 9-310(a), and its security interest in the A/R and Cash that are proceeds of the fuel would also have been perfected. U.C.C. § 9-315(c). But because IPC did not file a financing statement, its interest in the collateral is unperfected. Therefore, IPC's rights in the

-11-

fuel, the A/R, and the Cash would be subordinate to the rights of the Trustee, as a hypothetical lien creditor on the date of Debtor's bankruptcy filing. U.C.C. § 9-317(a)(2), § 9-102(a)(52)(C).

IPC contends, however, that the result is dramatically different because IPC and Debtor signed a consignment agreement rather than a security agreement. In support of this contention, IPC relies on U.C.C. § 9-319(a), placing overriding importance on the fact that the statute mentions consigned "goods," but is silent concerning the proceeds of those goods. IPC concedes (as it must) that its interest in the "goods"–the fuel–is subordinate to the Trustee's rights. But it claims that its rights in the fuel's proceeds–the A/R and Cash–is superior to Trustee's rights, because U.C.C. § 9-319 mentions only "goods." To accept IPC's argument, we would have to believe that, by omitting the word "proceeds" from U.C.C. § 9-319, the U.C.C. drafters silently negated all of the provisions cited above that treat a consignment as a security interest and treat a security interest in proceeds the same as the security interest in the original collateral. We cannot adopt such a strained interpretation of U.C.C. § 9-319. Instead, we read U.C.C. § 9-319 as simply providing that a consignee can sell and encumber consigned goods just the same as it could if it had title to the consigned goods.

U.C.C. § 9-202 reinforces this conclusion and also explains the difference between a true consignment and other types of security transactions. Recall that the formal difference between a typical secured transaction and a consignment is that

-12-

a consignor retains title to the collateral. Section 9-202 states that, with a limited and irrelevant exception, this difference does not matter. "Except as otherwise provided with respect to consignments . . . , the provisions of this article with regard to rights and obligations apply whether title to collateral is in the secured party or the debtor." Official Comment 3.a explains:

> **This section explicitly acknowledges two circumstances in which the effect of certain Article 9 provisions turns on ownership (title).** First, in some respects sales of accounts, chattel paper, payment intangibles, and promissory notes receive special treatment. See, e.g., Sections 9-207(a), 9-210(b), 9-615(e). Buyers of receivables under former Article 9 were treated specially, as well. See, e.g., former Section 9-502(2). **Second, the remedies of a consignor under a true consignment** and, for the most part, the remedies of a buyer of accounts, chattel paper, payment intangibles, or promissory notes **are determined by other law and not by Part 6.** See Section 9-601(g).

(Emphasis added.) In other words, the consignor's retention of title to the collateral may affect the remedies it can employ to recover the collateral in the event of default. But retention of title does not change the rules concerning priority among competing claimants to the collateral.

Our conclusion is bolstered by reference to the U.C.C. sections which governed true consignments prior to the revision of the U.C.C. in 2001. Before then, certain true consignments were dealt with in former U.C.C. §§ 2-326(3) and 9-114. Those provisions were deleted and replaced by U.C.C. §§ 9-109(a)(4), 9-103(d) and 9-319. See U.C.C. § 2-326 cmt. 4.

///

///

///

U.C.C. § 9-114[6] addressed priority in certain consigned goods and limited cases of identifiable cash proceeds received on or before delivery of the goods to a buyer. The Official Comments to U.C.C. § 9-114 give some insight into how consignors were subjected to Article 9's filing requirements for perfection and priority with respect to proceeds generated from the sale of their consigned goods.

The Official Comment to U.C.C. § 9-114 stated that if a consignor wished to have priority in accounts receivable or other proceeds (cash) generated from the sale of the consigned goods, it had to comply with the rules for the creation and perfection of a security interest contained in Article 9.

> Except in the limited cases of identifiable cash proceeds received on or before delivery of the goods to a buyer, **no attempt has been made to provide rules as to perfection of a claim to proceeds of consignments . . . or the priority thereof . . . .** It is believed that under many true consignments the consignor acquires a claim for an agreed amount against the consignee at the moment of sale, and does not look to the proceeds of sale. In contrast to the assumption of this Article that rights to proceeds of security interests under Section 9-306 represent the presumed intent of the parties (compare Section 9-203(3)), **the Article goes on the assumption that if consignors intend to claim the proceeds of sale, they**

---

[6] The statute provided:

A person who delivers goods under a consignment which is not a security interest and who would be required to file under [Article 9] by paragraph (3)(c) of Section 2-326 has priority over a secured party who is or becomes a creditor of the consignee and who would have a perfected security interest in the goods if they were the property of the consignee, and also has priority with respect to identifiable cash proceeds received on or before delivery of the goods to a buyer, if . . . the consignor complies with [specified notice requirements].

-14-

**will do so by expressly contracting for them and will perfect their security interests therein**.

Official Comment to U.C.C. § 9-114 (emphasis added).

In addition, Official Comment 2 to U.C.C. § 9-319 states, "[i]nsofar as creditors of the consignee are concerned, [Article 9] to a considerable extent reformulates the former law, which appeared in former [U.C.C.] Sections 2-326 and 9-114, without changing the results."

In the end, the rules pertaining to perfection and priorities of competing security interests apply to consignors who intend to claim priority in accounts receivable or cash generated from the sale of the consigned goods. It is undisputed that IPC did not comply with the U.C.C. requirements to protect itself against Debtor's creditors with respect to the A/R and Cash. Trustee's judicial lien attached to all Debtor's real and personal property on the Petition Date. Rev. Code Wash. § 6.17.090 (lien arises in all real and personal property). Therefore, IPC is simply an unsecured creditor and is subordinate to the rights of Trustee as a judicial lien holder. See also Bank of Cal. v. Thornton-Blue Pac., Inc., 53 Cal. App. 4th 841 (Cal. Ct. App. 1997) (flower grower who was in consignment arrangement with flower wholesaler was subordinate to wholesaler's lender who had security interest in flowers and proceeds from their sale).

## VI. CONCLUSION

For the reasons stated, we AFFIRM.

-15-